**In re POLAROID CORPORATION, et al., Debtors.**

**(includes: Polaroid Holding Company; Polaroid Consumer Electronics, LLC; Polaroid Capital, LLC; Polaroid Latin America I Corporation; Polaroid Asia Pacific LLC; Polaroid International Holding LLC; Polaroid New Bedford Real Estate, LLC; Polaroid Norwood Real Estate, LLC; Polaroid Waltham Real Estate, LLC).**

**John R. Stoebner, Trustee, Plaintiff,**

**v.**

**Ritchie Capital Management, L.L.C., as Administrative and Collateral Agent, Ritchie Special Credit Investments, Ltd., Rhone Holdings II, Ltd., Yorkville Investments I, L.L.C., and Ritchie Capital Structure Arbitrage Trading, Ltd., Defendants.**

Bankruptcy Nos. 08–46617, 08–46621(GFK), 08–46620(GFK), 08–46623(GFK), 08–46624(GFK), 08–46625(GFK), 08–46626(GFK), 08–46627(GFK), 08–46628(GFK), 08–46629(GFK).

Adversary No. 09–4032.

United States Bankruptcy Court, D. Minnesota.

April 30, 2012.

Nicole Siemens, Sandra S. Smalley–Fleming, Lindquist & Vennum P.L.L.P., Minneapolis, MN, for Plaintiff.

Brian F. Leonard, James M. Jorissen, Leonard O'Brien et al., Minneapolis, MN, Garrett M. Vail, Thomas C. Cronin, Cronin & Co. Ltd., Bloomington, MN, for Defendants.

## ORDER RE: PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

GREGORY F. KISHEL, Chief Judge.

This adversary proceeding came before the Court on the Plaintiff's motion for partial summary judgment. The Plaintiff ("the Trustee") appeared by his attorneys, Terrence J. Fleming, Sandra S. Smalley–Fleming, George H. Singer, and Mark S. Enslin (all of Lindquist & Vennum P.L.L.P., Minneapolis). The Defendants (collectively, "the Ritchie Defendants") appeared by their attorneys, Thomas K. Cau-

ley and Brian A. McAleenan (of Sidley Austin LLP, Chicago), and James M. Jorissen (of Leonard, O'Brien, Spencer, Gayle & Sayre, Ltd., Minneapolis). The following memorandum of decision is based on the record made for the motion.

## INTRODUCTION

Debtor Polaroid Corporation and several related companies were put into bankruptcy by voluntary petitions filed on December 18, 2008.[1] At that time, the ownership of the Polaroid Corporation was traceable through an intermediate holding entity to Petters Group Worldwide, LLC ("PGW"), itself a holding company. PGW and a number of business entities related to it had been put into bankruptcy about two months earlier. Before PGW's bankruptcy filing, one Thomas J. Petters was its sole shareholder, board chair, and chief executive officer.[2]

Earlier in the fall of 2008, Tom Petters and six of his business associates had been charged with various federal offenses in the United States District Court for the District of Minnesota: wire and mail fraud, money laundering, and conspiracy. The prosecution's overarching theory was that Tom Petters and his co-conspirators had conducted an elaborate and long-term Ponzi scheme, using as its instrumentalities a corporation known as Petters Company, Inc. ("PCI") and numerous related entities including PGW. As charged, the essence of the scheme was that Tom Petters and his fellow defendants had induced lenders and investors to advance money to PCI. The ostensible purpose of the advances was to fund proposed, intermediate

1. The Debtors commenced these cases under Chapter 11. The cases were converted to ones under Chapter 7 on August 31, 2009, after the closing of a sale of most of the estates' assets under 11 U.S.C. § 363.

2. All further references to him will use his nickname—the informal cognomen under which he had projected himself for years in business and the media, regionally and nationally.

purchases and resales of consumer electronic goods in bulk. However, the prosecution accused Tom Petters and his fellow defendants of using forged documents in the inducement to lend—when there were no corresponding, contracted transactions in real life and no such transactions came to pass that could be identified to particular loans. PGW was implicated in the scheme as an alleged recipient and conduit of a significant portion of the funding that had been received by PCI or its subsidiary entities.

Ultimately, all of the individual co-conspirators pleaded guilty under arrangements with the United States Department of Justice. On December 2, 2009, a jury convicted Tom Petters of all 20 felony charges that had been brought against him under a superseding indictment.[3]

When the Polaroid Corporation was placed into bankruptcy, the Ritchie Defendants claimed to hold an enforceable security interest in certain aspects of its intellectual property, specifically trademarks and associated rights registered in China, India, and Brazil. Tom Petters, in the capacity of "Chairman" of the Polaroid Corporation, had executed documents to grant that security interest on September 19, 2008.[4] (This was done five days before the Federal Bureau of Investigation executed a search warrant at PGW's corporate headquarters, in the legal process that led to the criminal charges.) When the security interest was granted, the Polaroid Corporation was not a debtor of the Ritchie Defendants. The pledge of the patent rights was expressly made to secure preexisting debt of third parties. That debt was evidenced by multiple notes executed by PCI, PGW, and/or Thomas Petters, Inc. ("the PCI/PGW note debtors") and given in favor of the Ritchie Defendants or for their benefit.[5]

**3.** Tom Petters is currently serving a 50–year sentence, which was imposed on him in April, 2010.

**4.** The recitations in this paragraph are all statements of uncontroverted fact; the Ritchie Defendants admitted virtually all of them in their answer, *see* pp. 5–6 *infra*, and in any event they are established by unrebutted documentary evidence.

**5.** To define further references to participants in the chain of events: "The PCI/PGW note debtors" will signify these three parties, collectively, and them alone. "The Petters organization" will signify a complex of companies in which Tom Petters was the controlling principal—one of three such complexes, but this one to include PCI, PGW, and their subsidiaries and affiliates with one major exception. "The Petters organization" will be used mainly in a connotative sense, i.e., for more general or historical reference and where precision as to the identity of corporate entities is not necessary. It will be used where a specific ruling as to liability, duty, or binding relationship is not being made. Use of the reference to "the Petters organization" will signify one cleaving line, however: the scope of the phrase does *not* cover the Polaroid Corporation, its immediate parent, or any of the Polaroid Corporation's affiliates in its own intercompany structure. "The Ritchie Defendants" will signify the five named defendants in this adversary proceeding as a group, collectively. Each of the Ritchie Defendants other than Ritchie Capital Management, L.L.C. took a secured position on separate debt under specific notes. But because a single agreement provided for all of them to share pari passu in all payment and other realization, and because the Trustee makes a frontal, collective challenge to their secured position against the Polaroid Corporation's assets, a collective reference is appropriate. "The Ritchie entities" will signify any and all individual or corporate participants controlled by Aaron Robert Thane Ritchie that had any part in the lending relationships with the PCI/PGW note debtors that were originated by Defendant Ritchie Capital Management, LLC. (That individual principal will be identified in shorter form as "Thane Ritchie," which appears to be the folksy cognomen that he preferred.) "The Ritchie entities" will include the five Ritchie Defendants, but will not

In February, 2009, the Polaroid Corporation commenced this adversary proceeding in the capacity of debtor-in-possession. After the conversion of the case, the trustee of that Debtor's estate under Chapter 7 was substituted as plaintiff.

The Trustee seeks to avoid the grant of the security interests to the Ritchie Defendants under the authority of bankruptcy law. Invoking 11 U.S.C. §§ 548 and 544, he characterizes the grant as a transfer fraudulent to the Polaroid Corporation's creditors under the federal and state iterations of fraudulent transfer remedies. He classifies the grant as both "actually" fraudulent (i.e., made with actual intent to hinder, delay, or defraud those creditors) and "constructively" fraudulent (i.e., made for less than reasonably equivalent value given to the Polaroid Corporation, coupled with the contemporaneous or subsequent insolvency of the Polaroid Corporation).

The Trustee seeks other relief, in the alternative or additional: avoidance of the grant of the liens as a preferential transfer under 11 U.S.C. § 547(b), "[t]o the extent that any of the transfers [of liens] were made … on account of a preexisting obligation …"; disallowance of the Ritchie Defendants' claims in the underlying cases pursuant to 11 U.S.C. §§ 502(b) and 502(d) (i.e., until any avoided transfers are rectified by payment or other form of restoration to the estate); avoidance of the Ritchie Defendants' liens under 11 U.S.C. § 506(d); equitable subordination of the Ritchie Defendants' claims in the underlying cases, pursuant to 11 U.S.C. § 510(c); "recharacterization" of the Ritchie Defendants' claims as "equity" received from what was "in substance and economic reality capital investment" by them; and declaratory relief that the liens are unenforceable under state-law principles of equity and for failure of consideration.

For their part, the Ritchie Defendants responded via a 38-page answer, heavy with fact allegations. They admit that the four named defendants other than Ritchie Capital Management, LLC made loan advances "to Thomas J. Petters … and companies owned and controlled by him," in February, March, and May, 2008. As to the grants of lien, they admit that "they and [the] Polaroid [Corporation] entered into an agreement titled Trademark Security Agreement dated September 19, 2008." They specify that the Trademark Security Agreement was contemplated by a prior but nearly-contemporary agreement between them and the PCI/PGW note debtors. Under that other agreement, maturity dates on the underlying payment obligations were extended.

As to the estate's theories for avoidance, the Ritchie Defendants flatly deny the complaint's allegation that the grants of security interests "were made with actual intent to hinder, delay, or defraud a creditor…."[6] They characterize the complaint's fact pleading as a "malicious attempt to create the false impression that [they] engaged in a fraudulent scheme," and that the Trustee's actual-fraud theory is "irresponsible and unconscionable because there is absolutely no basis for such an allegation."

be limited to them. This term also is to be taken in a more connotative, historically-minded sense. Its use is a fact-finder's hedge against the possibility that there were other lending—or assignee-entities in Thane Ritchie's enterprise structure that were involved in the transactions in question, but which are not clearly identified in the record at bar.

(One such has since emerged as a combative participant in the underlying bankruptcy case. *See In re Polaroid Corp.*, 460 B.R. 740 (8th Cir. BAP 2011).)

**6.** The Ritchie Defendants make this denial a second time, as a "Seventh Affirmative Defense" later in their answer.

Responding to the complaint's preferential-transfer count, the Ritchie Defendants insist that the grants of lien "were in no way made on account of 'antecedent debt' of Polaroid because: (a) the relevant debt was owed by PGW, PCI and [Tom] Petters and thus was not even 'debt' of Polaroid. . . ."

Finally, as an "Eighth Affirmative Defense" the Ritchie Defendants plead that they "gave value for" their receipt of the security interests, "and received such interests in good faith. . . ."

## JURISDICTION AND JUDICIAL AUTHORITY

This adversary proceeding is before the undersigned pursuant to 28 U.S.C. § 157(a), via the general reference of Loc. R. Bankr.P. (D.Minn.) 1071–1.

Of the counts entailed by the motion at bar, one is governed by substantive law contained in the Bankruptcy Code, Title 11 of the United States Code: 11 U.S.C. §§ 548(a)(1)(A) and 548(c). The second, governed by substantive state law, was brought by the Trustee under the empowerment of 11 U.S.C. § 544. The former arises under Title 11, and the latter arises in a bankruptcy case under Title 11; thus, the district court has jurisdiction over both counts. 28 U.S.C. § 1334(b). These counts are statutorily classified as core proceedings. 28 U.S.C. § 157(b)(2)(H). So are the counts for relief that would follow under the Bankruptcy Code's governance after the avoidance as a fraudulent transfer. 28 U.S.C. §§ 157(b)(2)(B) and (O). The last substantively-oriented count, toward the invalidation of liens as unenforceable under state law, is also a core proceeding—this time under 28 U.S.C. § 157(b)(2)(K). As such, a bankruptcy judge may order final judgment on all of these counts when that is substantively and procedurally appropriate. 28 U.S.C. § 157(b)(1).

## MOTION AT BAR

Earlier in this litigation, the parties and the Court addressed the sequence and means by which the various, complex issues could be presented for adjudication. The Trustee proposed that his requests for avoidance under the actual-fraud theory be developed and presented first. Ultimately, the Court acceded to the Trustee's request. The proposal included a stay on discovery, development, and submission as to the counts under a constructive-fraud theory. The Court ordered that stay.[7] After an initial skirmish over a counterclaim by the Ritchie Defendants, the litigation went through a briskly-conducted discovery process that generated wrangles

7. The Trustee's rationale for this was based mainly on considerations of expense. The Ritchie Defendants promised to zealously defend the constructive-fraud counts on the element of contemporaneous or consequent insolvency. This factual issue portended to be extraordinarily complex on the value side, given the unique positioning of the Polaroid Corporation and its subsidiaries in 2008. (By that time, the Polaroid entities had terminated their legacy manufacturing operations and had entered into a brand-purveying mode. They had transitioned out of their legacy film products but were only part way into the development of modern analogs using the new technologies of digital photography. The expenses of new product development were large and the breadth of currently-saleable product—manufactured by contractors—was not wide. Yet, it has been alleged throughout the cases that the Polaroid brand itself, intangible but recognizable worldwide, had and has large value in its own right.) The Trustee estimated that a full reconstruction of the value of the assets of the relevant debtor(s) for a case on insolvency could cost $1,000,000.00 or more, given the heavy prominence of intangibles in the asset structure. The Trustee also urged that a case on his actual-fraud theory could be developed at a fraction of that cost, using the specific strain of analysis now before the Court.

over protective orders. Finally, the motion at bar was filed.

The Trustee seeks a grant of summary judgment in his favor on five counts of his complaint: Counts I and III, those framed under the actual-fraud theory of avoidance as a fraudulent transfer; Counts VI and VII, through which the Ritchie Defendants' claims against the Polaroid Corporation's bankruptcy estate would be disallowed, and their liens avoided in consequence of that disallowance, after an avoidance of the lien as a fraudulent transfer; and Count X, through which he would have the Trademark Security Agreement and all actions taken under it declared void and unenforceable in consequence of inequitable conduct on the part of the Ritchie Defendants, and for failure of consideration.

The Trustee argues that the record supporting his motion "shows that there is no genuine dispute as to any material fact" and that he "is entitled to judgment as a matter of law" on the specific theory of avoidance he presents. *See* Fed.R.Civ.P. 56(c), *as incorporated by* Fed. R. Bankr.P. 7056. As a movant for summary judgment, the Trustee must satisfy both of these requirements. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Handeen v. Lemaire,* 112 F.3d 1339, 1346 (8th Cir.1997) (both noting that movant for summary judgment "always bears the initial responsibility of informing the [trial] court of the basis for its motion," i.e., identifying parts of record that show "the absence of a genuine issue of material fact"). If he does, a burden of production of evidence shifts over to the Ritchie Defendants, in the sense of having to produce evidence to rebut the fact elements that are undisputed on the Trustee's record. Fed.R.Civ.P. 56(e), *as incorporated by* Fed. R. Bankr.P. 7056; *Buford v. Tremayne,* 747 F.2d 445, 447 (8th Cir. 1984). If the Ritchie Defendants dispute the certainty of result on the governing law, they must produce on-point authority to counter the Trustee's legal argument. If the Ritchie Defendants fail in both aspects of the onus on them as respondents, the Trustee's motion must be granted. *Celotex Corp. v. Catrett,* 477 U.S. at 322–323, 106 S.Ct. 2548.

At the end of an 87–page main responsive submission of facts and law, the Ritchie Defendants simply request that the Trustee's motion be denied in all respects. (The proffered reasons for such a result sprawl in great detail and complexity over the preceding 86 pages.)

## ANALYSIS

### I. Trustee's Case in Chief: Avoidability of Grant of Trademark Security Interests, as Actually–Fraudulent Transfer.

▮ Though many additional facts are entailed by the Trustee's alternate and subsidiary theories, his motion on Counts I and III involves only one core fact issue: whether the grants of lien to the Ritchie Defendants were made with the intent to hinder, delay, or defraud the creditors of the relevant debtor, the Polaroid Corporation.[8] As the proponent of fraudulent-transfer remedies, the Trustee has the burden of proof on this element under both

---

**8.** It is well-established that the grant of a lien is a "transfer" within the scope of fraudulent transfer law. *In re Craig,* 144 F.3d 587, 591 (8th Cir.1998); 11 U.S.C. § 101(54) (defining "transfer" to include "the creation of a lien"); Minn.Stat. § 513.41(12) (defining "transfer" to include "creation of a lien or other encum-

brance"). Likewise, there is no dispute that the Trustee satisfies the two-year proximity requirement of § 548(a)(1); the liens here were granted less than 90 days before the Polaroid Corporation was put into bankruptcy.

federal and state law. *In re Craig,* 144 F.3d at 590 (applying § 548(a)); *In re Northgate Computer Systs., Inc.,* 240 B.R. 328, 360 (Bankr.D.Minn.1999) (applying § 548(a)); *Snyder Elec. Co. v. Fleming,* 305 N.W.2d 863, 867 (Minn.1981) (decided under Uniform Fraudulent Conveyance Act); *Elliot & Callan, Inc. v. Crofton,* 615 F.Supp.2d 963, 968 (D.Minn.2009) (applying Minn.Stat. § 513.45(b)); *New Horizon Ents., Inc. v. Contemporary Closet Design, Inc.,* 570 N.W.2d 12, 15 (Minn.Ct.App. 1997) (applying Minn.Stat. § 513.44(a)(1)).

■ On its face, of course, the inquiry on this point goes to a subjective state of mind on the part of the grantor-transferor. *In re Bob's Sea Ray Boats,* 144 B.R. 451, 458 (Bankr.D.N.D.1992).[9] The courts have repeatedly observed that this class of fact issue is difficult of direct proof, and generally requires a showing by circumstantial evidence. *E.g., In re Sherman,* 67 F.3d 1348, 1353 (8th Cir.1995). Historically, the courts have considered the issue of subjective intent as not automatically well-suited to summary judgment. *E.g., Pryor v. Nat'l Collegiate Athletic Ass'n,* 288 F.3d 548, 563 (3d Cir.2002); *In re Bankest Capital Corp.,* 374 B.R. 333, 346 (Bankr. S.D.Fla.2007).

However, the Trustee urges that the process of fact-finding on this issue is actually direct, much more confined, and much better-suited for summary adjudication than those general authorities suggest. The reason, he insists, is a context-specific analysis developed in fraudulent-transfer jurisprudence out of bankruptcy cases over the last several decades. He urges this court to use this analysis to recognize a "presumption of fraud," or at least a strong permissible inference of it, to be attributed to the grantor in transfers of

property that are made in the furtherance of a Ponzi scheme and induced by the purveyor of the scheme.

First, the Trustee argues, the actual long-term operation of a Ponzi scheme by Tom Petters through his corporate structure is not in dispute, having been admitted by the Ritchie Defendants. As the Trustee would have it, the Ritchie Defendants extracted the grants of lien from the Polaroid Corporation at their demand and via the direct act of Tom Petters, against the mounting failure of his Ponzi scheme. Thus, he argues, they were unquestionably in furtherance of the scheme at the time they were given. So, he concludes, there is nothing more to be established for a prima facie case for avoidance under the actual-fraud theory; and by extension from a grant of that remedy, he maintains, the remaining three counts involved in this motion should be conceded to him as well.

For their part, the Ritchie Defendants oppose the Trustee's invocation of the Ponzi scheme presumption on two different levels. The first is a rejection of the presumption, implied by the phraseology that "no court in the Eighth Circuit has ever applied" it as a device for fact-finding. This is tossed off *pro forma,* and in a combative tone; but because the quoted observation is correct in a technical sense, it requires attention as a threshold matter.

The second, however, is a major contention for the Ritchie Defendants. They are correct in their postulate. The Trustee seeks to have the presumption applied to a transfer that was made outside the structure of the Petters organization, which had been the operational core of the scheme; and thus far the courts have recognized and applied the presumption only as to

---

**9.** A century ago, the Minnesota Supreme Court identified the intent of the debtor-transferor as the key factor for the analysis on

actual fraud. *Underleak v. Scott,* 117 Minn. 136, 134 N.W. 731, 733 (1912).

transfers made by entities that directly purveyed Ponzi schemes. The question of whether a court may use the Ponzi scheme presumption as urged is a matter of first impression in a narrow body of case law that has burgeoned only since 2007–2008.

A. *The "Ponzi Scheme Presumption" Under Fraudulent Transfer Law.*

■ The territory here is not unfamiliar:

> A Ponzi scheme is generally understood as a multi-client investment arrangement executed over time, in which initial investors' infusions are wrongfully siphoned off, the fund never maintains enough cash to meet all its obligations, and the earlier clients' realization on investment is funded by later clients' infusions.

*In re Nation–Wide Exchange Servs., Inc.,* 291 B.R. 131, 148–149 n. 20 (Bankr. D.Minn.2003) (citing *In re Indep. Clearing House Co.,* 41 B.R. 985, 994 n. 12 and 998–1005 (Bankr.D.Utah 1984)). *See also In re Armstrong,* 285 F.3d 1092, 1093 n. 3 (8th Cir.2002) ("In a Ponzi scheme, the operator promises investors returns on their investment which the operator intends to pay from funds provided by new investors, rather than from profits generated by the underlying business venture...."); *In re Agric. Research and Tech. Group, Inc.,* 916 F.2d 528, 531 (9th Cir.1990) (citing *Cunningham v. Brown,* 265 U.S. 1, 44 S.Ct. 424, 68 L.Ed. 873 (1924), the seminal court opinion that treated the consequences of the failed investment-based scheme purveyed by one Charles Ponzi).

From time to time—and more frequently in recent years—the bankruptcy process has been used to redress the consequences of a failed Ponzi scheme and to provide some relief to unsatisfied creditors of the corporate vehicle of the scheme.[10] Intuitively, this is an apt match of remedies to a complex of problems. Bankruptcy, of course, evolved and persists as a statutory process to reconcile financial failure due to insolvency. Perforce, Ponzi schemes are operationally and structurally insolvent within their own confines:

> A Ponzi scheme cannot work forever. The investor pool is a limited resource and will eventually run dry.... [T]he scheme will eventually collapse as a result of the inability to attract new investors.... [I]nvestors at the end of the line will lose their money.

*In re Indep. Clearing House Co.,* 77 B.R. 843, 860 (D.Utah 1987).

For the application of bankruptcy to a failed Ponzi scheme, one of the means invoked for the redress of frustrated, unpaid latecomers is the panoply of avoidance remedies under fraudulent-transfer statutes, state and federal. The steward of a bankruptcy estate—a trustee under Chapter 7 or a debtor-in-possession under Chapter 11[11]—will sue to avoid transfers of money, property, or other value that the debtor had made to earlier investors, characterizing such transfers as fraudulent on the debtor's contemporaneous or future creditors. To justify the use of avoidance remedies, the plaintiff-trustee characterizes the transfer as actually fraudulent, constructively fraudulent, or (most commonly) both.

Ultimately, the notion behind the use of avoidance remedies against a satisfied, earlier investor is that its payment was

---

**10.** Such creditors may be late-arriving investors caught unpaid in the lurch; or they may be unpaid trade suppliers and vendors if the vehicle for the scheme had engaged in such facially-legitimate third-party transactions.

**11.** A debtor-in-possession under Chapter 11 "shall have all the rights, ... and shall perform all the functions and duties, ... of a trustee...." 11 U.S.C. § 1107(a).

made with the money of later victim-investors, and very much to the detriment of them, their contemporaneous fellow-creditors, and future creditors of the entities purveying the scheme. So, to meet bankruptcy's goal and context—to "put[ ] all parties that transacted with the purveyor ... onto a parity in ... restitution"—those who got out early, at least within the "periods of vulnerability to avoidance or recovery specified by [applicable] law," are legally compelled to pay into the estate and then may share pro rata with all victim-claimants at the end of the process. *In re Petters Co., Inc.*, 440 B.R. 805, 806 (Bankr. D.Minn.2010) (describing process of so-called "clawback" in bankruptcy).[12]

Whether styled under 11 U.S.C. § 548(a)(1) or under a state-law analog (here Minn.Stat. § 513.44(a)(1)), the actual-fraud theory has both a benefit and a burden for its proponent. In the first place, avoidance may be judicially allowed on proof of only one element; and, unlike the constructive-fraud alternative, that one element is worded in short and straightforward fashion in the statute.[13] But, that element is a subjective state of mind—and the relevant intent was that harbored by the transferor, or an individual person who effected the transfer on behalf of a corporate debtor-transferor.

Whenever a subjective state of mind is in play in fact-finding, the process of proof is challenging. Only rarely is there direct evidence of malign intent. *Kelly v. Armstrong*, 141 F.3d 799, 802 (8th Cir.1998);

*In re Sherman*, 67 F.3d at 1353. Thus, the proponent often must rely on an inferential process from circumstantial evidence. This can entail the assessment of all dimensions of credibility, and close analysis of the evidence by participating counsel and fact-finder alike. *In re Sherman*, 67 F.3d at 1353. In the specific context of a failed Ponzi scheme, there can be logistical difficulties: the purveyor(s) of the failed scheme may well be under the onus of the criminal process, thus cloaked from compelled testimony by a Fifth Amendment privilege; they may be physically isolated by conditions of pretrial confinement or post-sentencing incarceration; or they may be uncooperative and unreliable anyway.

The law's more general answer to such impediments was the evolution in judicial opinion and statute of the "badges of fraud" analysis to reach actual intent, well-developed in bankruptcy jurisprudence and in statute. *E.g., Kelly v. Armstrong*, 206 F.3d 794, 798 (8th Cir.2000); *Kelly v. Armstrong*, 141 F.3d at 802; *In re Sherman*, 67 F.3d at 1353–1354. That approach is not as easy of success as many trustees would have it, *In re Lumbar*, 446 B.R. 316, 331 (Bankr.D.Minn.2011), *rev'd in part on other grounds*, 457 B.R. 748 (8th Cir. BAP 2011), however much a "confluence" of enough badges of fraud may give rise to a rebuttable "presumption of fraudulent intent," *Kelly v. Armstrong*, 206 F.3d at 798. *Cf. In re Sharp Int'l Corp.*, 403 F.3d 43, 56 (2d Cir.2005) ("badges of

---

**12.** These general observations do not speak to the measure of recovery consequent to avoidance, after the application of meritorious affirmative defenses. Currently, the calculation of judgment in recovery in this sort of litigation is an issue in hot controversy, in multiple jurisdictions. *See, e.g.,* Karen E. Nelson, *Turning Winners into Losers: Ponzi Scheme Avoidance Law and the Inequity of Clawbacks*, 95 Minn. L.Rev. 1456 (2011).

**13.** For the case on constructive fraud, proof of contemporaneous or consequent insolvency, 11 U.S.C. § 548(a)(1)(B)(ii) and Minn.Stat. §§ 513.44(a)(2)(i)–(ii), and 513.45(a), can be very complicated where the debtor was a large and/or active business entity at the relevant time, making the processes of discovery and trial potentially quite expensive. This might befall the Trustee here, if this litigation were to get that far into that count.

fraud" do not create presumption of fraud, "but merely facilitate the analysis").

But, a number of courts have recognized a context-specific alternative, one that turns in a sense on one *big* badge of fraud. That analysis evolved in cases where the debtor in bankruptcy had furnished a structure for a Ponzi scheme that failed. The thought is that proof of the existence and operation of a Ponzi scheme through a debtor-entity, and a resultant judicial finding to that effect, plus the execution of a transfer of property out of the entity in furtherance of the scheme, is sufficient to support a finding of intent on the part of the transferor to hinder, delay, or defraud contemporaneous or future creditors of the debtor-entity.

The operation of the basic proof for fact-finding on the intent element has been classified both as an inference virtually-compelled, *In re Indep. Clearing House Co.*, 77 B.R. at 860; *In re Rothstein Rosenfeldt Adler, P.A.*, No. 10–2612, 2010 WL 5173796, at *5 (Bankr.S.D.Fla. Dec. 14, 2010), and as a presumption, *Perkins v. Haines*, 661 F.3d 623, 626–627 (11th Cir. 2011); *In re Manhattan Inv. Fund Ltd.*, 397 B.R. 1, 10–11 (S.D.N.Y.2007); *In re Dreier LLP*, 452 B.R. 391, 424–427 (Bankr. S.D.N.Y.2011). The distinction is academic, given the phraseology of the courts' analyses: "[i]ndeed, no other reasonable inference [as to the transferor's intent] is possible" in the Ponzi-scheme context. *In re Indep. Clearing House* Co., 77 B.R. at 860. *See also In re Pearlman*, 460 B.R. 306, 318 (Bankr.M.D.Fla.2011) (stating that a "Ponzi scheme is by definition fraudulent") (quoting *In re World Vision Entm't, Inc.*, 275 B.R. 641, 656 (Bankr. M.D.Fla.2002)).

■ So, regardless of the characterization, the basic proof still has the same outcome: to shift a burden of production of evidence on the ultimate fact over to the trustee's opponent. *See* Fed.R.Evid. 301. *Cf. Kelly v. Armstrong*, 206 F.3d at 799, 801 (if confluence of badges of fraud triggers presumption, opposing party may rebut presumption but must produce "direct ... rather than indirect" evidence of "legitimate supervening purpose" for transfer). Put another (and more pointed) way, once a trustee has proved the circumstances and the event noted two paragraphs previously, the defendant in the avoidance action must produce probative, significant evidence that the transferor-debtor *lacked* the intent to take the transferred value away from contemporaneous or future creditors, i.e., that there was a bona fide, legitimate purpose for the transfer. If it does not, it will receive an adverse finding on the central element of § 548(a)(1)(A), and perforce will suffer an adverse judgment of avoidance. *See In re Manhattan Inv. Fund*, 397 B.R. at 11 (holding that a transfer must "further a Ponzi scheme" for the presumption to apply); *see also In re Foos*, 188 B.R. 239, 244 (Bankr.N.D.Ill.1995) (holding that the basis of presuming fraud is not present where Ponzi scheme operator conducts ordinary business transactions outside of the scheme), *rev'd on other grounds, In re Foos*, No. 96C3982, 1996 WL 563503 (N.D.Ill. Sep. 23, 1996).

There is no cogent argument against using this device for fact-finding in the appropriate context. In context, its logic is unassailable; given the very ethos of a Ponzi scheme, the transferor-purveyor invariably is intentionally cheating all others in the web, when it uses a current investor-creditor's infusion—made ostensibly toward a specific transaction or purpose that would benefit that lender—to pay a preexisting investor-creditor. When both lenders are unaware of the actuality, this preserves the pretense of a functioning, viable investment operation that is in-

volved in extrinsic business activity. The fraud on all new infusers of cash goes with the territory. It is what makes the scheme work—for a while.

To the extent that the Ritchie Defendants argue from any flat rejection of the "Ponzi scheme presumption" or a "Ponzi scheme inference" as a valid tool for fact-finding on fraudulent intent where appropriate to context, their argument has no merit.[14]

### B. Presence and Operation of a Ponzi Scheme Within Tom Petters's Enterprise Structure.

Under this theory, the threshold point for fact-finding is the existence and operation of a Ponzi scheme, within the structure of the Petters organization. That exercise may seem superfluous, to anyone who has been involved in the intense three-year history of related federal court proceedings in this district, under criminal, civil, and bankruptcy jurisdiction. And to all appearances, the Ritchie Defendants have conceded the point on the record in this litigation, one way or another and at least to circumscribed effect.[15] Nonetheless, it is appropriate to make an independent finding on the Trustee's uncontroverted evidence: at all times material to this adversary proceeding, Tom Petters

did operate a Ponzi scheme, most centrally purveyed through PCI and a number of its many subsidiaries, but eventually involving more of his companies in the flow of money to keep it going.[16]

The transactional vehicle through which Tom Petters purported to operate the scheme is known in the consumer-goods side of the marketing sector as the "diverting business." [17] "Diverting" is an extension or offshoot of the sort of activity in which Tom Petters made his start in Minnesota in the 1980s, the liquidation of outdated or unwanted stocks of consumer merchandise. "Diverting" is conducted at one level above retail, however, and on a mass basis. One engaged in "diverting" functions as a finder and go-between. First, the "diverter" finds large lots of goods that are not moving through the inventory of a wholesaler or chain retailer. (With Tom Petters, the merchandise was ostensibly larger-ticket consumer electronics like flat-screen television sets or game consoles.) Then it finds a retailer that wishes to purchase such goods for resale to the public, and it takes the steps to see that the goods are acquired and sold to the party needing them.

A "diverter" may function as an intermediate owner, actually taking title to the

---

**14.** The Ritchie Defendants do make a more focused argument—that the transfers in question here took place outside the direct structure of any PCI-centered Ponzi scheme, so the presumption should not be extended to the transfers in question. That issue is treated later.

**15.** See, e.g., Ritchie Defendants' Opposition to Motion for Partial Summary Judgment, [Dkt. No. 85] ("Defs.' Opp'n"), at 15 ("No one contends that Polaroid operated a Ponzi scheme. Rather, as the Trustee acknowledges ... PCI engaged in the Ponzi scheme."), 16 ("Ritchie never suspected that Tom Petters was conducting a massive fraud until after the FBI raid...."), 22 ("The Ponzi scheme orch-

estrated by Tom Petters involved PCI's diverting business....").

**16.** Just recently, the existence of something very big and very bad in the operations of Tom Petters's enterprise structure has been recognized by two federal appellate forums, in collateral matters. See United States v. White, 675 F.3d 1073 (8th Cir.2012); Peterson v. McGladrey & Pullen, LLP, 676 F.3d 594 (7th Cir.2012). See also In re Lancelot Investors Fund, L.P., No. 08 B 28225, 2012 WL 761593 (Bankr.N.D.Ill. Mar. 8, 2012).

**17.** In light of what Tom Petters was actually doing, the component wording of this term is grossly ironic.

goods via purchase from an overstocked seller, either in its own right or through an affiliate-entity. (This was how Tom Petters pretensed the transactions in his operation.) This purchase is financed by a third-party "investor"—generally a lender to the intermediate holder of title—which is to be paid upon the closing of the end-customer's purchase.

Intuitively, at least, and given the obvious realities of the contemporaneous underlying market in the subject goods, this process does not have the structure to regularly generate a high profit margin. The reasons are several. The overstock goods may be languishing in inventory because of mounting obsolescence or past overproduction, making them less desirable to the end-consumer and hence of less value to any retailer selling to the consumer. The target purchaser from the "diverter" is more likely to be a retail discounter, often one possessing enough market dominance to compel cutthroat pricing from its suppliers. And such clientele do their own business in a fickle marketplace roiled by rapid product innovation; they would be reflexively plagued by the fear of having too much of "the last big thing" on-hand, and naturally would push a high-volume, quick-turnover mode of operations. None of these characteristics would be conducive to a large markup imposed by a diverter-intermediary. That fact logically would make diverting "high-volume, low-margin," were it to be conducted in a sustainable fashion.

This is the milieu against which Tom Petters held himself out to prospective "investors" as a well-connected operator, able to make quick connections for large deals that would close so rapidly and at such a raw amount of profit that he could offer handsome returns to lenders.[18] Some of his lenders apparently contemplated more generous, larger extensions of credit, with broader security interests or other security. More of them lent in on a transaction-by-transaction basis, ostensibly to finance individual deals that involved particular lots of goods that Tom Petters and his associates identified to orders from specific retailer-purchasers with well-recognized names.[19] These ostensible lending transactions were documented as secured. The collateral was to be the specific lots of electronics and their proceeds in the form of the ostensible account receivable from an end-customer, plus a personal guaran-

18. Pl.'s Exh. 8 (Partial transcript of testimony of Deanna Coleman (10/28/09), filed in *U.S. v. Petters*, 08–cr–364 (D. Minn.)) [Filed under Dkt. No. 65, Affidavit of Sandra Smalley–Fleming, Esq.], at 544–546. The bulk of the exhibits identified as "Pl.'s Exh." are farmed into the record for this motion through the affidavit of Sandra Smalley–Fleming, Esq., [Dkt. No. 65], using the numbering assigned in that affidavit. All of these documents were generated during the Trustee's investigation or discovery. Unless noted, the cited factual content of them has not been countered by evidence put into the record by the Ritchie Defendants. Other exhibits from the Trustee were docketed separately and are identified with their associated docket numbers; and with the exceptions treated in a separate order on the Ritchie Defendants' motion to exclude, their receipt into the record not disput-ed either. To the extent that the underlying content of any exhibit was received into the record under seal, the sealing is now released to the extent of the text quoted or the factual matter summarized in a finding. (All such sealing was done by stipulation of the parties. The Court acceded to that, to avoid a lengthy *in camera* review on the preliminaries. At least to the extent of the material used for this decision, it is now clear that none of it qualifies as "trade secret or confidential research, development, or commercial information," 11 U.S.C. § 107(b)(1), and none of it is "scandalous or defamatory matter," 11 U.S.C. § 107(b)(2).)

19. Pl.'s Exh. 8 (Coleman testimony tr.), at 546–549.

tee from Tom Petters.[20]

There apparently was some bona fide "diverting" activity within Tom Petters's enterprise structure, on a sporadic basis. However, for years before 2008 the great majority of the "diverting" that Tom Petters and his associates presented to prospective lenders was fictitious. The "transactions" simply were not in process; the ostensible suppliers did not have the goods in reality, and the Petters organization had not even contacted the ostensible end-purchasers to solicit them.[21] The corresponding evidence for prospective sales to established "big box retailers" (purchase orders, invoices, and the like) was forged.[22]

As presented to his lenders, the central entity for the diverting activity was PCI. PCI functioned as a recipient and disburser of much (*but not all*) of the lent-in funding. It also was the parent of numerous subsidiary companies. These subsidiaries were individually established as "special purpose entities," to serve as the repositories for funding from specific lender-investors and subsequent repayment to them.[23]

It is undisputed that Tom Petters used this modus operandi over an extended period of years, to churn increasingly-large volumes of money through business entities within this enterprise structure.[24] Over that time few authentic diverting

transactions were parlayed through PCI and its subsidiary-structure.[25] Repayment to earlier lender-investors, involving higher and higher rates of return, was funded by the proceeds of lending-in from later investors, ostensibly tied to new diverting transactions but simply without a basis in reality. Tom Petters and a select few associate-employees at his direction funneled the input funding through PCI and other entities within the Petters organization toward the satisfaction of debt now due and payable to earlier lenders, which had ostensibly invested in specific diverting transactions that were to have closed. As this went on, much of the churn was applied to the cost of an elaborate facade for public view, including expensively-furnished office headquarters, payment of substantial employee compensation and bonuses, and large draws by Tom Petters, plus high incremental rates of return to lenders.

One noteworthy use of funds siphoned from lender-investor infusions was the acquisition of the Polaroid Corporation and its related companies for Tom Petters's enterprise structure in 2005. The record contains uncontroverted evidence that all or virtually all of the 400 million-plus dollars that Tom Petters paid for the acquisition came out of PCI, which in turn had derived those funds from loans from inves-

---

**20.** Pl.'s Exh. 8 (Coleman testimony tr.), at 546–547 and 551.

**21.** For most of the inducements to lend in the latter years of the scheme's operation, the suppliers were identified as additional intermediaries—Enchanted Family Buying Company and Nationwide International Resources, Inc., outside entities operated by individuals in knowing conspiracy with Tom Petters and a limited number of his organization's employees. Pl.'s Exh. 8 (Coleman testimony tr.), at 549–550.

**22.** Pl.'s Exh. 8 (Coleman testimony tr.), at 549–550.

**23.** Affidavit of Theodore F. Martens [Dkt. No. 66] ¶ 4.

**24.** Pl.'s Exh. 6 (Partial transcript of deposition of Deanna Coleman (7/28/10)) [Dkt. No. 65], at 28–35 (reference to 13 years of operation of Ponzi scheme); Defs.' Exh. 83 (Affidavit of Theodore F. Martens (1/09/10), filed in *U.S. v. Petters*, 08–cv–05348 (D.Minn.)) [Filed under Dkt. No. 85, Affidavit of Andrew J. Budish, Esq.], ¶¶ 5–6.

**25.** Pl.'s Exh. 8 (Coleman testimony tr.), at 545–546, 549–550.

tor-lenders.[26] It is not clear from this record whether Tom Petters made the Polaroid acquisition solely to add surface luster to his enterprise, i.e., to impress prospective investor-lenders with his apparent business acumen as a general matter.[27] But it is clear that he and his associates hoped to exploit the wow-factor of a legacy brand's presence, in promoting him and his ostensible diverting activity to third parties.[28]

The result of all this, over time, was the vast shortfall of assets to meet liabilities. That has been established via forensic accounting reconstruction to total 3.5 to 3.7 billion dollars.[29] The shortfall weighs principally on a small number of lenders who were "left in" when the Petters structure collapsed in September, 2008.[30] So, regardless of any concession by the Ritchie Defendants, there is an independent basis of fact on which to apply the Ponzi scheme presumption, in a fashion appropriate to context.

C. *Application of the Ponzi Scheme Presumption to Transfer Made by a Related Entity Outside the Main Operation of the Scheme.*

■ The Ritchie Defendants categorically reject the Trustee's invocation of the Ponzi scheme presumption to the specific transfer at bar:

> The Trustee argues that the transfer of certain liens in international trademarks of Polaroid Corporation ... to Ritchie is presumptively an avoidable fraudulent transfer because Tom Petters had run a Ponzi scheme through a separate entity, Petters Company, Inc. . . . but the Ponzi scheme presumption applies only where

---

**26.** Pl.'s Exh. 8 (Partial transcript of testimony of Tom Petters (10/28/09), filed in *U.S. v. Petters*, 08–cr–364 (D.Minn.)) [Filed under Dkt. No. 65, Affidavit of Sandra Smalley–Fleming, Esq.], at 3170; Pl.'s Exh. 6 (Coleman depo. tr.), at 51; Pl.'s Exh. 16 (Government Exhibit Nos. 67, 67A–E) (confirming source of funds via tracing through bank account records). At Tom Petters's criminal trial, an agent of the IRS Investigation Division Command testified to confirm the source of the funding for the Polaroid acquisition in PCI-received investor-lending, on the basis of her own forensic investigation. Exh. 8 (Partial transcript of testimony of Kathy Klug (10/28/09), filed in *U.S. v. Petters*, 08–cr–364 (D.Minn.)) [Filed under Dkt. No. 65, Affidavit of Sandra Smalley–Fleming, Esq.], at 2284–2290.

**27.** He well may have had a separate, additional intention to revive and use the Polaroid brand as a profit source in legitimate operations in its own right, as another motivation for the purchase. His subsequent actions do include concerted effort to obtain funding for research, development, and marketing of Polaroid-branded products through the separate corporate structure of the Polaroid enterprise.

**28.** Pl's Exh. 6 (Coleman depo. tr.), at 111 (testifying that "he [Tom Petters] bought Polaroid ... so it would lure investors in so investors would think Tom was this wealthy guy").

**29.** *See* Defs.' Exh. 83 (Martens affid. (01/09/10)), ¶ 11 (estimating contractual losses alone at 3.5 billion dollars, but noting that analyses of investor losses was ongoing). When reports of the Petters scheme first broke in the local media in late September and early October, 2008, it was termed "the largest investor fraud scheme in American history." That characterization was eclipsed barely three weeks later, when the Bernard Madoff matter came to light in New York; and recently news coverage of at least one other Ponzi scheme (the Allen Stanford matter in Texas) has cited to financial losses larger than those identified to Tom Petters. Whatever its relative ranking, this is still one of the largest such financial scandals in U.S. history—and it certainly is the largest in Minnesota's history.

**30.** The two largest groupings of these end-stuckees had to be put into bankruptcy themselves: the Lancelot Investors Fund group based in Chicago (formerly administered by the now-convicted and—imprisoned Greg Bell), and the Palm Beach group in Florida and the Cayman Islands.

the *Debtor* itself engaged in the Ponzi scheme and the transfer at issue was in furtherance of that scheme. Consequently, no court anywhere has ever applied the Ponzi presumption to a transfer from a debtor not operating a Ponzi scheme.

Defs.' Opp'n at 8 (emphasis in original) [pagination per CM/ECF header].

The Ritchie Defendants justify this position on the mechanics that underlie the presumption and its articulated justification in the inevitability of collapse. They insist that there is no such platform for the presumption where the transferor-debtor was not the immediate purveyor of the Ponzi scheme—however much it was related to and under control of the purveyor—and where the transferor-debtor carried on a regular, non-fraudulent business in its own right:

> Thus, because a legitimate business is not a Ponzi scheme that will inevitably fail, the Ponzi presumption has never been applied to transfers by a legitimate business.

Defs.' Opp'n at 9.

This argument is not frivolous, given the relative nascence of the case law on the Ponzi scheme presumption. But in the end it is not tenable; it is deliberately myopic and unduly constrained. Adopting it would elevate abstraction—corporate form and the ostensible segregation of corporate operation—over reality—a hard and dirty manipulation of corporate form and control by a cynical but desperate defrauder, toward significant damage albeit to a different creditor-body.[31]

This theory of defense fails in application to the facts at bar because in context the relevant intent is that harbored by one natural person only, and here that is Tom Petters. His intent is attributed to the Polaroid Corporation as transferor, because he controlled that artificial entity.[32] And the point of the Trustee's theory is that Tom Petters also controlled the whole structure centering around PCI, through which the Ponzi scheme had been transacted to the detriment of its final victims. The Trustee does not posit that Tom Petters had maintained an unimpregnable firewall between PCI's machinations and

---

31. Many lawyers in the PCI/PGW and Polaroid Corporation cases have latched onto particular turns of phrase in written decisions from earlier in the cases, to attribute some nuance that is not inherent in the wording. So, to make it clear: the adjective "ostensible" denotes the quality of being part of the comprehensive *pretense* of engagement in large-scale, bona fide, real-life business in consumer-goods purveying, that Tom Petters *projected* to lender-investors, many of his companies' employees, and the public at large. It is *not* to be taken as a reference to a transaction contracted or closed in real life, or to any counter-party to a real-life transaction. Far too many lawyers have used references to the "business" of PCI (and PGW) as if to suggest that there really had been a large volume of real "diverting" business before the fall of 2008. So far, the evidence in the cases has shown that Tom Petters engaged in few

such transactions, those mainly through his "Red Box"-branded entities and operations. "Ostensible" thus denotes the *projection* of a false reality—which was quite effective on a very large scale, until the money stopped coming in.

32. Pl.'s Exh. 10 (Partial transcript of deposition of David Eric Baer (8/11/10), [Dkt. No. 65], at 624–625). Notably, Tom Petters was Polaroid's chairman, sole board member, the 100% beneficial owner of all of Polaroid's stock, and he retained sole and final authority on all Polaroid transactions. Pl.'s Exh. 30 (Partial transcript of deposition of Simon Root (3/31/10)) [Dkt. No. 65], at 132; Pl.'s Exh. 9 (Partial transcript of deposition of Mary Lynn Jeffries (4/13/10)) [Dkt. No. 65], at 121, 144; Pl.'s Exh. 8 (Petters testimony tr.), at 3184.

the operations of Polaroid Corporation.[33] But even if he had, the Ritchie Defendants' point is not viable; the applicability of the presumption comes down to the controlling person's *motivation* for effecting the specific transfer by the non-purveyor, "legitimate" business entity, when and as the transfer is made. The past operation of a freestanding business by the "legitimate" related entity and the abstract possibility of continuing such an operation do not bar the application of the presumption.

■ The reason is as follows. The Trustee's expanded conception of the presumption is premised on common control within a larger structure. When this is the governing consideration, the automatic inference of fraudulent intent is made when the person in common control effects the transfer by the entity extrinsic to the Ponzi scheme, *but in order to further the scheme* as it has been maintained *through the central entity.* Yes, the creditors hindered, delayed, and defrauded by the transfer are not the direct victims of the Ponzi scheme in its operation, i.e., investors into the entity through which the scheme has been purveyed. Nonetheless, it is a readily-identifiable group: the creditors of the related entity that makes the

transfer for the benefit of the purveyor-entity. The intent that is deemed via the inference is the intent to deprive *those* parties of the value of their legal recourse against the debtor with which they are in privity, i.e., the transferor that gives up its own assets at the beck of the person in common control, to satisfy a creditor of the purveyor-entity that is not a creditor of the transferor-entity.[34]

This sort of ultimate intent, directed toward the target group of creditors, is deemed upon a finding of an intentional transfer made in a specific sort of broader context. The proof lies in a motivation: a manifest wish by the controlling person to prolong the imposture of the Ponzi scheme (thus "furthering" it), by effecting the transfer by the controlled, related company.

There is nothing untoward about using the presumption in this way. Under the judicial articulation of the presumption, the idea of "furthering" the scheme is *act*-oriented (as signified by the use of a verb) rather than *structure*-oriented (as would be signified by identification to a noun). Where the close relationship inherent in common and exclusive control of closely-held companies is present, and surround-

---

**33.** Anything but, and not just because siphoned funds from investors into PCI were used to purchase the Polaroid Corporation. The forensic and direct evidence establishes that funds that came into the Petters enterprise structure via exploitation of Ponzi-scheme victims were directed through and beyond PGW and the Polaroid Corporation's structures at Tom Petters's direction, as the need arose. This annexed these other entities to the scheme's operation, even though they did not become part of its center. Throughout the bankruptcy cases of PCI/PGW and the Polaroid Corporation, the Ritchie entities have based much of the theory of their positions on the existence of a "clean side" and a "dirty side" in Tom Petters's enterprise structure—with their interface falling on the clean side only and thus immune to challenge now. The reality was just not so; eventually Tom

Petters manipulated all or nearly all of it to enable the scheme.

**34.** The intent to take asset value away from creditors that otherwise would look to it for realization on their claims is an intent to hinder, delay, or defraud those creditors, for the application of the fraudulent transfer laws. *In re Sholdan,* 217 F.3d 1006, 1010–1011 (8th Cir.2000) (affirming trial court's finding of intent to defraud in such a state of mind). This is very much the notion of intent that underlies the Ponzi scheme presumption, as originally articulated; the intent is to divert an infusion of funds away from the assumed, specific purposes for which they are lent or invested, toward repayment of earlier, separate obligations now due.

ing conditions are desperate enough for the fortunes of the individual purveyor-controller, the deeming of intent to basic actions is a simple matter of recognizing a continuity inherent in the circumstances, and manifested by past historical fact: "crooked then and there, crooked now and here." The victims of the transfer are different from the victims of the core scheme itself; but that does not mean the basic willingness to prejudice others' rights is absent.

The resulting inference, satisfying the intent requirement of the statute, can always be rebutted by hard proof of contrary intent, i.e., a credible motivation to make the transfer that is grounded in good economic reason, *as to the transferor-entity*. *Kelly v. Armstrong*, 206 F.3d at 799, 801. However, making the inference via presumption in this variant situation only recognizes the predictable and preponderant action of human nature, in the corner of its corrupt and self-deceiving tendencies.

In short, as a matter of logic, judicial policy, and fundamental fairness, the Ponzi scheme presumption can be applied to the Polaroid Corporation's encumbrance of valuable intellectual property rights in favor of the Ritchie Defendants. Such an application does go beyond the matrix of phenomena on which the presumption was first conceived; but it does so on proper considerations of the basis and purpose of the presumption.

D. *Tom Petters's Intent in Effecting the Grant of Security Interests to the Ritchie Defendants: Applying the Presumption, and Also the Badges of Fraud.*

At this point, the historical backdrop to the Polaroid Corporation's pledging of its intellectual property rights is the key to the applicability of the Ponzi scheme presumption.

The transactional history among the Petters organization, the Ritchie entities, and then the Polaroid Corporation spanned barely ten months in 2008. The Polaroid Corporation was not even a participant in any related legal undertaking until the last single month. Albeit multi-staged, the transactional facts are all uncontroverted. The evidence that goes to the parties' contemporaneous states of mind stands unrebutted. Much of it is communication objectively memorialized in e-mail form.

Whether the presumption is applied or not, the sweep of the dealings among these three groups of participants leads to only one supportable inference as to the intent harbored by Tom Petters, which is to be deemed to the Polaroid Corporation on its grant of liens to the Ritchie Defendants. The following are the uncontroverted facts going to that,[35] organized by historical sequence into three categories.

1. *The Ritchie Defendants' Initial Lending Into the Petters Organization.*

1. By January, 2008, the Ponzi scheme that Tom Petters was purveying through the Petters organization began to experience deep structural and operational strain. The United States economy was slowing and business credit was tighter and tighter. Tom Petters was finding it more difficult to find parties willing to lend into PCI and his other entities. Pl.'s Exh. 8 (Coleman depo. tr.), at 564.

---

**35.** For clarity and ease in future review of this decision, findings will be set forth in separate numbered paragraphs, sequentially to the end of the analysis of all issues. The use of arabic numerals for the paragraphs abuts into the outline-format organization of the sections of the analysis, but there is no way to avoid that.

2. At the same time, the Ritchie entities and Thane Ritchie, their individual principal, were experiencing distress of their own. Thane Ritchie personally and several of his companies had been the respondents in an enforcement action commenced by the Securities and Exchange Commission. They had been charged with engaging in "late trading," the practice of backdating trades in mutual fund shares to take advantage of market events that occurred after the close of daily market trading. Pl.'s Exh. 43 (Securities Exchange Commission Order (2/05/08)) [Dkt. No. 65]. This was alleged to have taken place over a period of approximately three years. *Id.* On February 5, 2008, a consent order was entered in that proceeding. *Id.* Under it, defendant Ritchie Capital Management, LLC was censured; disgorgement of approximately 37.4 million dollars was ordered; and Ritchie Capital Management and Thane Ritchie, jointly and severally, were fined an additional 2.5 million dollars.[36] *Id.*

3. Later in the business day of January 31, 2008 (4:34 p.m.), one George Johnson, a broker at Capital Financial Advisers, LLC in Chicago, made contact with Thane Ritchie via e-mail. Johnson offered him the possibility to "participate in a short-term financing deal[ ]," "secured by the assets of a company with value far exceeding the value of the note." Johnson was acting as a "finder" of funding for Tom Petters and his entities. Pl.'s Exh. 44 (E-mail chain between George Johnson and Thane Ritchie) [Dkt. No. 65].

4. Before that date, Thane Ritchie had had only two contacts with Tom Petters: a meeting at the Petters organization's of-fices in 2002 and a telephone call in 2005. Neither had resulted in significant progress toward a Ritchie entity directly lending to a Petters entity. Pl.'s Exh. 41 (Partial transcript of deposition of Aaron Robert Thane Ritchie (5/25/10)) [Dkt. No. 65], at 22–24.

5. Thane Ritchie responded to Johnson via e-mail that evening (8:08 p.m.), with a show of interest and a query: "What kind of assets? Company?" Pl.'s Exh. 44 (E-mail chain between Johnson and Ritchie).

6. In the early afternoon of February 1, 2008 (1:27 p.m.), Johnson replied:

> We have to move fast.... I will send you a term sheet.... 90 day loan (20% interest ... 80% annualized ... backed by the entire Polaroid corporation).

*Id.* Also that day, Tom Petters, Thane Ritchie, and Johnson held a conference call, during which Thane Ritchie learned that PGW sought to "bridge a loan or bridge a sale of the ... Polaroid North American brand to the Iconix Corporation, and [Tom Petters] needed some short-term financing to pay off JPMorgan." Defs. Exh. 65 (Partial transcript of deposition of Aaron Robert Thane Ritchie (5/25/10)), [Dkt. No. 85], at 44–46; see also Defs. Exh. 66 (Partial transcript of deposition of David Baer (8/9/10)), [Dkt. No. 85], at 53 ("The Ritchie loans were intended as a bridge loan ..."). By the end of that day (a Friday), the following actions were performed:

a. David Baer, PCI's in-house counsel, had e-mailed a term sheet to Thane Ritchie's attorney, with Petters Capital, LLC identified as the borrower. Pl.'s Exh. 45 (E-mail from David Baer to Michael Legamaro with at-

---

**36.** It is not directly relevant to any legal issue at bar, but it is uncontroverted that the Ritchie Defendants were investment funds that received capital from their own private clients, pooled it, and then relent it to borrow-ers. The Ritchie Defendants take great umbrage to the Trustee's characterization of them as "hedge funds," but the applicability of that colloquial term is not legally relevant.

tachments (2/1/08)) [Filed under seal at Dkt. No. 70].[37]

b. Camille Chee–Awai, an employee of Petters Capital, LLC, e-mailed Thane Ritchie several documents regarding the Polaroid Corporation, including a document purporting to be a draft of the Polaroid Corporation's audited financial statement for 2006 and an evaluation of the Polaroid brands prepared by Duff & Phelps. Pl.'s Exh. 46 (E-mail chain among Camille Chee–Awai, Thane Ritchie, and others) [Filed under seal at Dkt. No. 70].

c. A Ritchie entity had wired 31 million dollars to a bank account maintained by PCI. An attorney for the Ritchie entities at Sonnenschein, Nath & Rosenthal, LLP in Chicago confirmed the transaction via a statement sent by e-mail at 5:22 p.m. Pl.'s Exh. 47 (E-mail chain among Michael Legamaro, David Baer, and others) [Filed under seal at Dkt. No. 70].

d. PCI transferred out 31 million dollars to prior lender-investors ostensibly in its diverting business. These recipients included PC Funding, LLC (an SPE formed for PCI's borrowing transactions with the Opportunity Finance entities); PB Finance Holdings, Inc. (an SPE formed for PCI's borrowing transactions with the Palm Beach entities); and Thousand Lakes, LLC (an SPE formed for PCI's borrowing transactions with Lancelot-related entities). Martens Affid. ¶¶ 4, 8; Pl.'s Exh. C (PricewaterhouseCoopers preliminary analysis of Ritchie and Associated Funds Note Payable Detail) [Filed under Dkt. No. 66, Martens Affid.].

Shortly after midnight that night (12:48 a.m., Saturday, February 2), Baer sent an e-mail to Thane Ritchie; John Wappler, an associate at Ritchie Capital Management; and Tom Petters. He gave them "thanks to all for accomplishing an amazing transaction today! Have a nice weekend." Pl.'s Exh. 47 (E-mail chain among Michael Legamaro, David Baer, and others).

7. Only later on Saturday, February 2 (via e-mail sent at 9:47 p.m.) did Thane Ritchie ask Wappler and John Kermath, the president of Ritchie Capital Management, to review the Polaroid-related documents that Chee–Awai had sent on Friday. His directive was: "Need to know what Polaroid equity is worth." Pl.'s Exh. 48 (E-mail chain among John Wappler, Thane Ritchie, and others) [Filed under seal at Dkt. No. 70]. Wappler and Kermath had not been aware previously that the 31 million dollars had been wired the day before. Pl.'s Exh. 31 (Partial transcript of deposition of John D. Kermath (5/24/10)) [Dkt. No. 65], at 54; and Pl.'s Exh. 49 (Partial transcript of deposition of John Michael Wappler, Jr. (5/21/10)) [Dkt. No. 65], at 94–95 (stating that he did not know whether Thane Ritchie's directive had only posed a hypothetical).

8. Wappler replied variously on Sunday, February 3, very early (e-mail sent 1:11 a.m.) and in the late afternoon (e-mail sent 5:01 p.m.). In the first, after "[j]ust taking a stab at some quick valuations," Wappler acknowledged a "wide range of possible equity values" for the Polaroid Corporation. Among other things, he noted the company had had net losses of 40

---

**37.** Petters Capital, LLC, like Polaroid Holding Company, was a wholly owned subsidiary of PGW. *See* Exh. 1 of PwC Interim Report (Organizational Chart of Petters's Affiliated Bankruptcy Entities) (12/15/10), filed in *In re Petters Company, Inc.*, 08–45257 (Bankr. D.Minn.) [Dkt. No. 809].

million dollars in 2006 and 65 million dollars in 2007; that it was "(hopefully) in the middle of a turnaround process" by "[s]hifting focus from Consumer Electronics to Digital Imaging/Digital Home products"; and that "[a]t the end of the day, the $426 MM that Petters paid for Polaroid in 2005[was] probably as good an estimate as any" for the value of the equity. In the latter, Wappler queried Thane Ritchie:

> The proposed loan is being used for activities which are 100% unrelated to Polaroid, correct? Specifically, I just want to make sure that if the idea that the loan proceeds are being used for doesn't pan out, Polaroid value is unaffected.

Pl.'s Exh. 48 (E-mail chain among Wappler, Ritchie, and others).

9. As a result of e-mail exchanges with Camille Chee–Awai throughout Sunday, February 3, Wappler had raised (by e-mail sent at 12:40 p.m.) the possibility of the Ritchie lenders taking a position against the value of the Polaroid equity that would be subordinate to large preexisting debt obligations owed by the Polaroid Corporation to Petters-related entities. Pl.'s Exh. 51 (E-mail chain among John Kermath, Thane Ritchie, and others) [Filed under seal at Dkt. No. 70]. By that evening (e-mail sent 7:48 p.m.), Wappler was voicing concerns over the exposure to the Ritchie entities to be had from any further lending to PCI, if secured by a lien against the stock in Polaroid Corporation:

> We may need a standstill from Petters with regard to exercising their rights against the company since they have a demand note. The alternative is to keep Petters as a co-borrower as we have now, then our positions are aligned.

*Id.*

10. At 3:47 a.m. on Monday, February 4, Thane Ritchie e-mailed Wappler and Kermath, and Jay Menton (another employee of the Ritchie entities):

> [N]othing usual about this deal including the IRR!!—need to make sure we get the pledge against Pol all lined up this week—standstill or first right o refusal makes sense[.]

*Id.*

11. The next day, Monday, February 4, the Ritchie Defendants advanced another 56 million dollars to PCI via wire transfer. Martens Affid. ¶ 8; Pl.'s Exh. C (PwC preliminary analysis of Ritchie and Associated Funds Note Payable Detail).

12. On the same day, PCI disbursed a total of 55 million dollars for the benefit of four different lenders that had previously advanced to PCI on ostensible diverting-business transactions. The recipients were the Palm Beach and Thousand Lakes SPEs, plus PAC Funding, LLC (the SPE associated with Acorn Capital Group, LLC) and Metro Gem, Inc. On the same date, PCI disbursed funds to PGW and Sun Country Airlines (a company held by Tom Petters through intermediate holding companies). Martens Affid. ¶ 8; Pl.'s Exh. C (PwC preliminary analysis of Ritchie and Associated Funds Note Payable Detail).

13. Between February 5 and February 19, 2008, the Ritchie entities disbursed a total of 59 million dollars in *additional* funds to PCI, via wire transfers made on February 5th, 7th, 15th, and 19th. Martens Affid. ¶¶ 4, 8; Pl.'s Exh. C (PwC preliminary analysis of Ritchie and Associated Funds Note Payable Detail). On all four days, PCI disbursed funds for the benefit of prior lenders to PCI on account of ostensible diverting business transactions, in amounts equal to or larger than the Ritchie entities had lent by their near contemporaneous advances. Martens Affid. ¶ 8; Pl.'s Exh. C (PwC preliminary

analysis of Ritchie and Associated Funds Note Payable Detail).

14. The Polaroid Corporation received none of the funds advanced by the Ritchie Defendants, at any time. *Id.* Pl.'s Exh. 9 (Partial transcript of deposition of Mary Lynn Jeffries (4/13/10)) [Dkt. No. 65], at 107–108, 245–246. Further, the Ritchie Defendants disbursed the funds without a contemporaneous memorialization of the alleged intent to bridge a sale of the Polaroid North American brand to Iconix.

15. Finally, on February 19, 2008 (the date of the last advance from the Ritchie entities), Thane Ritchie and Tom Petters executed a written "Note Purchase Agreement" to memorialize terms and consequences for the loan advances that the Ritchie entities had already made to PCI. Tom Petters and *PGW* were the nominal parties identified as "Borrowers" in the Note Purchase Agreement. Pl.'s Exh. 27 (Note Purchase Agreement) [Filed under seal at Dkt. No. 68]. Ritchie Capital Management, in the identified role of "the initial 'Administrative Agent'," was the other signatory-party to the agreement itself. Tom Petters's and PGW's obligations expressly ran to a group of "Purchasers" of the contemplated notes, which were identified in an attached schedule. Among those listed purchasers were the remaining Ritchie Defendants in this adversary proceeding: Ritchie Special Credit Investments, Ltd. ("RSCI"); Rhone Holdings II, Ltd. ("Rhone II"); and Yorkville Investments I, L.L.C. ("Yorkville I"). The Note Purchase Agreement contemplated the issuance and sale by Tom Petters and PGW of up to 155 million dollars in promissory notes to the "Purchasers" identified on the schedule. The Note Purchase Agreement includes signed signature pages for RSI, Rhone II, and Yorkville I, with references to specific notes sold to RSI (total of 84 million dollars, notes dated February 1 to 19, 2008); Rhone II (total of 34 million dollars, notes dated February 4 to 19, 2008); and Yorkville I (total of 18 million dollars, notes dated February 5 and 15, 2008). *Id.* As to the Note Purchase Agreement:

a. Tom Petters and PGW had "sole discretion" to use the proceeds from the Ritchie entities' advances, for any purpose. *Id.* § 1.3.

b. Though the notes as a whole "need not have the same terms and conditions," "each Note issued pursuant to this Agreement [was to] rank *pari passu* with each and every other Note issued pursuant to this Agreement...." *Id.* § 1.1.

c. Thane Ritchie understood that this meant that there were no restrictions on Tom Petters and PGW as to how they used the funds, and he acquiesced because in his words, "Tom was pretty convincing that it would really screw up their business if we put a lot of restrictions on the loans." Pl.'s Exh. 41 (Ritchie depo. tr.), at 76.

d. Thane Ritchie knew that the funds advanced would be used to pay existing debt of PGW, PCI, or the Polaroid Corporation. *Id.*, at 75–78; Pl.'s Exh. 8 (Petters testimony tr.), at 3045. He was told that one of the reasons was an ostensible problem with "bad paper," i.e., difficulties in enforcing purchase orders from ostensible customers of the diverting business. Pl.'s Exh. 10 (Baer depo. tr.), at 650–654, 716–717, 722–723.

e. Thane Ritchie contemplated the possibility that the debt to the Ritchie Defendants would be repaid by Tom Petters "go[ing] out and rais[ing] debt from other sources." Pl.'s Exh. 41 (Ritchie depo. tr.), at 83–84. The possibility that this was a Ponzi

scheme did not concern Thane Ritchie. *Id.*, at 84–85.

16. By February 19, 2008, Tom Petters had executed ten separate promissory notes on behalf of himself and PGW, to evidence the total of 146 million dollars in advances that the Ritchie Defendants had disbursed to PCI by then. Pl.'s Exh. 54 (Promissory notes from PGW and Tom Petters to the Ritchie Defendants) [Filed under seal at Dkt. No. 71]. As to the notes:

 a. Each and every one bore an annual interest rate of 80%. *Id.* This feature "shocked" Simon Root, PGW's outside counsel, and was unprecedented in his experience. Pl.'s Exh. 30 (Root depo. tr.), at 74–75, 132–133.

 b. Per Kermath, this interest rate was the very highest of any lending on the Ritchie group's portfolio. Pl.'s Exh. 31 (Kermath depo. tr.), at 78.

 c. Three of the notes, with a total principal of 21 million dollars, were due in March, 2008. Pl.'s Exh. 54 (Ritchie–PGW/Petters promissory notes). The others were due in May, 2008. *Id.*

 d. Though the Note Purchase Agreement and the notes recited the parties "endeavoring to use" stock in the Polaroid Corporation as collateral, the pledge of the shares was *not* made when the advances were made or when the Note Purchase Agreement was executed. *Id.;* Pl.'s Exhs. 55 (E-mail from Mike O'Shaughnessy to John Kermath (2/19/08)), 56 (Subordination Agreement among Ritchie Defendants and PGW and others), 57 (Termination Agreement among Ritchie Defendants and PGW

and others) [Each filed under seal at Dkt. No. 72]; Pl.'s Exh. 30 (Root depo. tr.), at 147–148; Pl.'s Exh. 10 (Baer depo. tr.), at 714–716. No security was given on the notes other than the personal guaranty of Tom Petters. Pl.'s Exh. 30 (Root depo. tr.), at 134; Pl.'s Exh. 31 (Kermath depo. tr.), at 179. The Ritchie entities agreed to this as the security at this time, and proceeded to finalize the Note Purchase Agreement. Pl.'s Exh. 10 (Baer depo. tr.), at 714–716; Pl.'s Exh. 30 (Root depo. tr.), at 147–148.

 e. In connection with the taking of Tom Petters's personal guaranty, the Ritchie entities did not request or receive personal financial statements for him, or personal income tax returns. Pl.'s Exh. 41 (Ritchie depo. tr.), at 69; Pl.'s Exh. 19 (Partial transcript of deposition of James Wehmhoff (7/7/10)) [Dkt. No. 65], at 95.

17. Tom Petters and PGW failed to make any payment on the three notes that came due by March 18, 2008. Pl.'s Exh. 54 (Ritchie–PGW/Petters promissory notes); Pl.'s Exh. 33 (Allonges relating to loans among the Ritchie Defendants and PGW and Tom Petters) [Filed under seal at Dkt. No. 68]. The Ritchie Defendants extended the due date for those notes by 60 days, without demanding additional consideration. Pl.'s Exh. 33 (Ritchie–PGW/Petters allonges).

18. During March, 2008, PCI and one of the Ritchie entities finalized documents to memorialize a separate lending transaction, ostensibly to finance the purchase of a large lot of PlayStation game consoles for resale via a diverting transaction.[38]

---

**38.** The copy of the documents in the record does not feature a signature by the "Purchas-

er" or an associated date, so the identity of the specific Ritchie entity is not known.

Pl.'s Exh. 28 (Note Purchase Agreement) [Dkt. No. 65]. The Ritchie entity was to take 50% of the profit from the anticipated sale, plus the repayment of its 31 million dollar advance. Pl.'s Exh. 58 (Letter agreement between PCI and Ritchie Capital Management, Ltd.) [Filed under seal at Dkt. No. 72]. The advance was memorialized in two notes, executed by Tom Petters and PCI, which bore an interest rate of 67% per annum and a due date of July 14, 2008. Pl.'s Exh. 59 (Promissory notes among Ritchie Defendants and PCI and Tom Petters) [Filed under seal at Dkt. No. 72].

19. Thane Ritchie received from PCI a purported purchase agreement for the PlayStations, bearing the name of UBid. com Holdings as purchaser. Pl.'s Exh. 60 (E-mail with attachments from Deanna Coleman to Thane Ritchie) [Dkt. No. 65]. This and associated documents submitted to Thane Ritchie had been fabricated by Deanna Coleman, using information taken from the website of the Best Buy Company. Pl.'s Exh. 6 (Coleman depo. tr.), at 68–78. The Ritchie entities' attorney questioned the capacity of this proposed purchaser to perform on a deal of the indicated size (the 79 million dollars of stated consideration for the sale appearing to be greater than the identified purchaser's 43 million dollars in net revenue the prior year). In response, Tom Petters summarily offered a change of purchaser—to Costco. Pl.'s Exhs. 61 (E-mail chain among Kenneth Rosenblum, Simon Root, and others (3/21/08)), 62 (E-mail chain among David Baer, Simon Root, and others (3/21/08)), 63 (E-mail chain among Deanna Coleman, Simon Root, and others (3/21/08)), 64 (uBid Holdings, Inc.'s Form 10–K) [Each filed at Dkt. No. 65]. PCI never provided a purchase order from Costco to Thane Ritchie, because it did not

have such a sale in prospect. Thane Ritchie did not contact UBid or Costco directly. Pl.'s Exh. 30 (Root depo. tr.), at 154–159.

20. The Ritchie entities advanced 31 million dollars to be made to PCI, by a wire transfer made on March 21. Martens Affid. ¶ 8; Pl.'s Exh. C (PwC preliminary analysis of Ritchie and Associated Funds Note Payable Detail). Though the Ritchie lender and PCI were to profit-share on the transaction, Thane Ritchie did not have anyone verify that PCI had actually made the 21 million dollar investment in a diverting transaction that was required by the lending terms. Pl.'s Exh. 30 (Root depo. tr.), at 154–159.

21. On the same date, PCI disbursed a total of 33 million dollars to its creditors, including the Fidelis Foundation and three SPEs associated with lenders to PCI. It also disbursed a total of 1.2 million dollars to PGW and Sun Country Airlines on the same date. Martens Affid. ¶ 8; Pl.'s Exh. C (PwC preliminary analysis of Ritchie and Associated Funds Note Payable Detail).

22. On May 9, 2008, the Ritchie entities advanced an additional 12 million dollars to the Petters organization, by a wire transfer made to PCI. Martens Affid. ¶ 8; Pl.'s Exh. C (PwC preliminary analysis of Ritchie and Associated Funds Note Payable Detail). This was memorialized by a promissory note executed by Tom Petters on behalf of PCI, PGW, and himself personally. Pl.'s Exh. 29 (Promissory notes among Ritchie Defendants and PCI, PGW, and Tom Petters) [Filed under seal at Dkt. No. 68]. This note specified an interest rate of 362.10% per annum. *Id.*

23. On the same day of this advance, May 9, PCI disbursed 49 million dollars to

There is no dispute that a contract with this content was executed.

three SPEs associated with its lenders, plus a total of 9.5 million dollars to Sun Country Airlines, PGW, and ZINK Imaging, LLC.[39] Martens Affid. ¶ 8; Pl.'s Exh. C (PwC preliminary analysis of Ritchie and Associated Funds Note Payable Detail).

*2. The PCI Borrowers' Default; Wrangling Over Unsecured Status of the Debt.*

24. By May 19, 2008, the ten promissory notes to the Ritchie entities executed originally in February came due, with accrued interest of over 20 million dollars. Pl.'s Exh. 33 (Ritchie–PGW/Petters allonges); Pl.'s Exh. 54 (Ritchie–PGW/Petters promissory notes). The Ritchie entities extended the maturity date on all of the notes for another 60 days. Again, no additional consideration was given for the extension, and the debt remained unsecured. Pl.'s Exh. 33 (Ritchie–PGW/Petters allonges).

25. In June, 2008, Deanna Coleman confided to Wappler that PCI had used the 146 million dollars that the Ritchie Defendants had advanced in February, to pay earlier lenders into PCI. Pl.'s Exh. 49 (Wappler depo. tr.), at 46–47, 154–155; Pl.'s Exh. 6 (Coleman depo. tr.), at 92–94, 99–100, 220–229; Pl.'s Exh. 68 (E-mail chain among John Wappler, Deanna Coleman, and others) [Dkt. No. 65]. On Wappler's demand for more information, she supported her statement by a spreadsheet that showed particular PCI lenders paid by the funds Ritchie had advanced. Pl.'s Exhs. 67 (E-mail from Deanna Coleman to Tom Petters and others (6/30/08)), 68 (E-mail chain among Wappler, Coleman, and others), 69 (E-mail chain among John Wappler, James Wehmhoff, and others)

[Each filed at Dkt. No. 65]; Pl.'s Exh. 6 (Coleman depo. tr.), at 92–94, 99–100, 220–229; Pl.'s Exh. 49 (Wappler depo. tr.), at 46–47.

26. During the early summer of 2008, dialogue between the Ritchie and Petters organizations continued, over the status of the outstanding debt. Pl.'s Exh. 41 (Ritchie depo. tr.), at 142–143, 149–153; Pl.'s Exh. 49 (Wappler depo. tr.), at 33. There were meetings in person that included, variously, John Wappler, James Wehmhoff, Tom Petters, Thane Ritchie, Polaroid Corporation CEO Mary Jeffries, and other persons. Pl.'s Exh. 49 (Wappler depo. tr.), at 33–41. During these meetings, Tom Petters dwelt on the Polaroid organization and its future potential to regain a position in the retail market—to the exclusion of meaningful detail about the near-term prospects of payment to the Ritchie Defendants. *Id.* at 39–40.

27. As the notes to the Ritchie entities approached another due date in late July, 2008, Thane Ritchie tasked Wappler with investigating the availability of collateral from the Petters organization, in connection with any further extension of the due dates. *Id.* at 33, 42–43, 68–69, 150–151, 168. Wappler became concerned that the obligors under the notes—PCI, PGW, and Tom Petters—were not able to pay them off at that time, and that the obligations had been unsecured to that point. *Id.* at 50–52. The concurrent, mounting illiquidity in the general capital markets was putting additional pressure on all parties in the situation, including the Ritchie entities, in Wappler's estimation. *Id.* at 52.

28. On August 14, 2008, the commencement of suit by another lender to Tom Petters came to Thane Ritchie's attention.

**39.** ZINK Imaging, LLC had been spun off from the Polaroid Corporation several years earlier, for the development of consumer photographic products and supplies using digital technology.

Pl.'s Exh. 41 (Ritchie depo. tr.), at 152–153, 175; Pl.'s Exh. 71 (Summons and Complaint, filed in *Acorn Capital Grp., LLC v. Petters,* 08–cv–07236 (S.D.N.Y.)) [Dkt. No. 65]. The action was venued in the United States District Court for the Southern District of New York. The plaintiff was Acorn Capital Group, LLC; the amount demanded in judgment was 50 million dollars. That plaintiff asserted that it held a security interest in some of the Polaroid Corporation's assets, including intellectual property rights, under a grant made by Tom Petters, but that he had committed fraud in the inducement by misrepresentations and breaches of warranty as to the identity and value of the collateral. Pl.'s Exh. 71 (Summons and Complaint).

29. At that time, Thane Ritchie concluded that the allegations in Acorn Capital Group's complaint contradicted Tom Petters's earlier representations to them, i.e., that the assets of the Polaroid Corporation were unencumbered. Pl.'s Exh. 41 (Ritchie depo. tr.), at 152–153, 183–184. In response, he sent Wappler to Minnesota and told him not to leave "until we had our collateral." *Id.* at 175.

30. As of September 1, 2008, all of the PCI/PGW note debtors were in default to the Ritchie Defendants. Pl.'s Exh. 54 (Ritchie–PGW/Petters promissory notes); Pl.'s Exh. 33 (Ritchie–PGW/Petters allonges); Defs.' Answer ¶ 34 (admitting that "all of the Notes . . . were technically in default as of August 31, 2008 . . . .") [Dkt. No. 8]. The Ritchie Defendants continued to demand collateral, as a condition of not calling the notes. Pl.'s Exh. 34 (E-mail from Thane Ritchie to Tom Petters (8/28/08)) [Filed under seal at Dkt. No. 69]; Pl.'s Exh. 35 (E-mail from Michael Legamaro to David Baer, Simon Root, and others (9/6/08)) [Dkt. No. 65]; Pl.'s Exh. 72 (Email chain among Michael Legamaro, David Baer and others) [Dkt. No. 65].

The prospect that Tom Petters and his entity structure were insolvent was "an issue on the table and being discussed," as between Tom Petters and the Ritchie organization. Pl.'s Exh. 30 (Root depo. tr.), at 173–174. Obligations by companies in the Petters organization to other large creditor-related entities were in default. Those creditors were demanding payment, audits, and physical inspection of ostensible collateral. Pl.'s Exh. 73 (E-mail chain between Deanna Coleman and Tom Petters) [Dkt. No. 65]. In early September, Tom Petters was giving frantically-worded directives to employees of entities to find solutions, without offering specific ideas of his own:

> I have serious need to get this done so we can get out of the box? Otherwise I am afraid I will not be able to? Any ideas on short term money to nbe [sic] taken out in 30 days nby [sic] this new 200mm dollar deal will A must. Any or all ideas I can't be there till Friday afternoon to late to do Sabes and Ubid and others. I know everyone will ask what about the money we are owed. So do I. We need hedge deal resolved first or risk even larger problems. We need a team effort on getting Fhut, real estate, sun country notes, mu equity in hedge fund and or whatever assets we need or choices are bleak. please respond ig [sic] you have any sold ideas for all or part of a 60million dollar bridge? ? ?I need your help.
>
> Thanks tom

Pl.'s Exh. 74 (E-mail chain among Tom Petters, David Baer, and others) [Dkt. No. 65].

31. At this time, the Ritchie entities' outside counsel implicitly threatened suit if his clients did not receive "a blanket lien on the assets of PCI":

> [Given that this is not the first such "inability to give us what which has been

promised and the overall unwillingness to be transparent with us, you are only further putting the nail in your coffin, presumably causing things to unravel from here."] If you want to work an amicable resolution of our issues, you must—immediately—release to us credit agreements which supposedly impact your ability here. Frankly, you are losing credibility fast and that will be a very dangerous path to take. Pl.'s Exh. 35 (E-mail from Legamaro to Baer, Root, and others (9/6/08)).

32. At the same time, the Polaroid Corporation was going through a cash shortage and it was delinquent on payments to its vendors. Pl.'s Exh. 75 (E-mail chain among Polaroid employees Scott Hardy and Philippe Kalmbach, and others) [Dkt. No. 65]. Around August 28, 2008, the Ritchie entities' outside counsel were questioning whether taking security against the Polaroid Corporation would have any value, given the assertions in the Acorn litigation that Polaroid Corporation had preexisting secured debt to PAC Funding, LLC (the Acorn-related SPE), that encumbered the Polaroid Corporation's assets. Pl.'s Exh. 76 (E-mail chain among Kenneth Rosenblum, Simon Root, and others) [Dkt. No. 65]; Pl.'s Exh. 77 (E-mail chain among Kenneth Rosenblum, Simon Root, and others) [Dkt. No. 65].

33. In an e-mail exchange that spanned September 15–16, 2008, Thane Ritchie demanded of Tom Petters that "we need to finalize our loans," and "lets get docs signed." Pl.'s Exh. 78 (E-mail chain between Tom Petters and Thane Ritchie) [Dkt. No. 65]. By an e-mail sent to Tom Petters on September 18, Thane Ritchie threatened that "this will get very messy without an agreement in place today." He insisted that he "was last money in and should be first out," as compared to the Lancelot entities that had lent into PCI.

Pl.'s Exh. 79 (E-mail from Thane Ritchie to Tom Petters (9/18/08)) [Filed under seal at Dkt. No. 72].

> *3. The Grant of the Trademark Security Interests by the Polaroid Corporation.*

34. On September 19, 2008, Thane Ritchie and Tom Petters executed a final extension agreement as to the ten outstanding notes. A new maturity date of December 19, 2008 was fixed. Pl.'s Exh. 36 (Extension and Amendment Agreement) [Filed under seal at Dkt. No. 69]. On the same date, Tom Petters, on behalf of the Polaroid Corporation and in the stated status of its "Chairman," executed a Trademark Security Agreement in favor of Ritchie Capital Management, as "collateral agent" for "the February Note Purchasers" under the Note Purchase Agreement executed on February 19 and the "May Note Purchasers" that had been involved in the May 9 advance to which Tom Petters had committed himself, PCI, and PGW. Pl.'s Exh. 37 (Trademark Security Agreement) [Filed under seal at Dkt. No. 69]. Under the Trademark Security Agreement, the Polaroid Corporation purported to grant a security interest in the trademarks in Brazil, India, and China and associated property rights that the Polaroid Corporation then held or would thereafter adopt or acquire, to secure the various debt obligations of the PCI/PGW note debtors that had been reset to the new due date. *Id.* at Term 2(a).

35. The Polaroid Corporation had not received any of the funds that the Ritchie Defendants had advanced to PCI and PGW under the ten promissory notes. Nor did it receive any monies from the Ritchie Defendants at the time it granted the trademark security interests, or at any time after that. Martens Affid. ¶ 8; Pl.'s Exh. C (PwC preliminary analysis of Rit-

chie and Associated Funds Note Payable Detail); Pl.'s Exh. 9 (Jeffries depo. tr.), at 103, 107–108, 245–246.

36. Mary Jeffries, the CEO of the Polaroid Corporation, only found out about Tom Petters's intention to grant the trademark security interests, when David Baer e-mailed her the final agreements, which were later signed without her presence and over her objections. Pl.'s Exh. 9 (Jeffries depo. tr.), at 119–121. She told David Baer and Tom Petters that she "would prefer it not be done." *Id.,* at 120–121. Tom Petters rejected her objection. *Id.* at 121. She then expressed that she "was not happy about it," to Michael Phelps, another executive in the Petters enterprise structure. *Id.* Jeffries recognized that "Ritchie was getting collateral for loans they had already made *to Petters.*" *Id.* at 116. She also recognized immediately that the grant of lien significantly reduced the unencumbered assets of the Polaroid Corporation, which "made it difficult to raise new financing for" the company in its own right. *Id.* at 117–122. The Polaroid Corporation needed such financing at the time, to furnish working capital for its ongoing operations. *Id.* at 128.

37. On September 25, 2008, Tom Petters met with Thane Ritchie and Wappler in Tom Petters's aircraft hangar. Pl.'s Exh. 41 (Ritchie depo. tr.), at 147. At that time, Tom Petters executed an additional inter-creditor agreement running among Petters Capital, LLC, RWB Services LLC (by Lancelot Investment Management, L.L.C.), Ritchie Capital Management, L.L.C., and others. This document was contemplated by the September 19 extension agreement. Pl.'s Exh. 80 (Security and Inter-creditor Agreement) [Filed under seal at Dkt. No. 73]. The terms of the inter-creditor agreement had been negotiated over the previous week. The agreement required the consent of Greg Bell, on behalf of the Lancelot entities that were large creditors of the Petters organization. *Id.;* Pl.'s Exh. 79 (E-mail from Ritchie to Petters). These events took place one day *after* the FBI's raid on the Petters organization's corporate headquarters and Tom Petters's residence. Pl.'s Exh. 11 (Application and Affidavit for Search Warrant relating to Tom Petters's home and office) [Dkt. No. 65].

E. *Inferences as to Intent, on the Uncontroverted Facts at Bar.*

1. *Application of Presumption Under Federal Law: 11 U.S.C. § 548(a)(1)(A).*

█ As noted earlier, the Ponzi scheme presumption is triggered in this variant context by evidence of two facts: first, an intentional act of transfer; and then a specific sort of motivation for having the related third-party transferor make the transfer.

The former point is not controversial. Tom Petters obviously knew what he was doing in September, 2008 when he finally granted the security interest to the Ritchie Defendants.

For a good seven months, Tom Petters had held the Ritchie entities at bay, resisting their mounting entreaties for a grant of security through the Polaroid enterprise. His tactics got him and the Petters organization through the four-month term of actual lending advances from the Ritchie Defendants, and three months after that—without giving a nickel's worth of collateral for over 150 million dollars of new debt. Thane Ritchie let him do it, over and over again. He did so without stopping the advances at any stage, to extract the formal grant of the security originally contemplated—a lien against the stock in the Polaroid Corporation. All the while, Thane Ritchie paid little mind to the use of the Ritchie entities' funds, such as whether they actually led to a sale of the

Polaroid North American brand to Iconix, as originally contemplated. And then Tom Petters gave in to stricter terms extracted for an extension of the due date for payment of the full debt incurred via those ten prior advances.[40] Every action of the Ritchie Defendants between early February and mid-May bespoke Thane Ritchie's willingness to assume significant risk on the ten advances in the short term.

Obviously, Tom Petters took the benefit of that willingness, over and over again. The funds he obtained from the Ritchie Defendants enabled him to mollify multiple preexisting creditors that were already ensnared in the Ponzi scheme. It was only months after the last advance that Tom Petters resorted to the Polaroid Corporation's assets to secure debt that was not of its making, under threats by the Ritchie Defendants that would have collapsed his whole enterprise structure.

In its requirement that a transfer have been made in furtherance of a Ponzi scheme, the presumption looks to the motive for the transfer. Put another way, the transferor must have intended that the transfer facilitate the preservation of the scheme, undetected by its current creditors and future investors. Under the original iteration of the presumption, the benefit from the transfer flows back—to preexisting creditors—and its brunt falls contemporaneously and going forward—on the investor-creditor that has lent on the inducement of a direct return from the purveyor's ostensible use of the funds for a valid transaction. When the presumption is applied to a transfer by a third party related to the purveyor, there is an equally-cognizable brunt. It falls on that transferor-entity's own creditors; whether present or future, all of them are unaware that ready value has been extracted out of the entity against which they otherwise had legal and practical recourse on their claims. As long as the all-controlling purveyor is motivated by a wish to conceal and carry on the main scheme, the deeming of any intent to hinder, delay, or defraud the separate transferor's creditors is as plausible as it is under the original iteration. Really, it is as undeniable; it just goes with the territory.

That recognition is all that is necessary to trigger the presumption here. In finally caving to the Ritchie Defendants' demand for assets as collateral, Tom Petters was struggling to prevent the collapse and disclosure of the Ponzi scheme structured around his ostensible "diverting" business. That disaster would have followed on the declaration of a default by the Ritchie Defendants, and their ensuing suit on direct and guaranty liabilities. Clearly, Tom Petters believed that such action would have finished him; it would have ended his options to wheedle new private investor-funding. Yes, the soundness of such a belief was probably nil, at a time when mounting tension and stasis in world financial markets was drying up capital anyway.

---

**40.** Granted, according to Thane Ritchie, representatives at Goldman Sachs could not divulge information to the Ritchie entities regarding the Iconix transaction because of a non-disclosure agreement. Defs.' Exh. 65 (Ritchie depo. tr.), at 80–81. However, in his deposition Thane Ritchie admitted that the status of an Iconix sale "wasn't a big concern" because he believed PCI, PGW, or Tom Petters could repay the Ritchie Entities in "infinite ways." Pl.'s Exh. 41 (Ritchie depo. tr.), at 78–79, 83–84. While he says the Ritchie entities "did due diligence" on those "infinite" other sources of repayment, *id.,* nothing suggests that they performed any further due diligence than will be discussed below within the context of the Ritchie entities' alleged good faith. All of this says volumes about the level and nature of risk that Thane Ritchie was willing to assume at the beginning, and to bear for months after that—until the risk played out to a significant threat, and he demanded and extracted a very different form of security long after the fact.

However, the mere fact of the motivation is the point, and not its realism.

When Tom Petters allowed the Ritchie Defendants to structure the security as a direct encumbrance of valuable assets of the Polaroid Corporation, he was giving accommodations that he had not previously countenanced.[41] Now, he was willing to take the first claim to the value of those assets away from two groups of creditors within the Polaroid Corporation's own debt structure.[42] His changed willingness was manifested by the intentional act of finally going ahead and doing so, making the pledge for the benefit of creditors alien to the Polaroid Corporation's debt structure.[43]

41. In the beginning, the discussions had been toward a grant of lien *in the stock of* the Polaroid Corporation. Wappler's early analysis was all framed in mind of that sort of collateral and lien.

42. Those two groups, of course, were the direct, non-insider creditors within the company's debt structure, and the large liabilities to PCI and other PCI-related entities that had been booked as earlier intercompany transactions.

43. As part of their "kitchen sink" strategy in defense, the Ritchie Defendants insist that the ultimate inference is not possible—because there is "evidence that Polaroid was solvent, i.e., the value of its assets exceed[ed] the value of its liabilities, and hence one cannot rationally *presume* that the Ritchie Liens were transferred with an intent to defraud or otherwise harm Polaroid's creditors." Defs.' Opp'n at 28–29. This argument presupposes a much higher bar for the Trustee than Eighth Circuit precedent actually imposes. *See In re Sherman*, 67 F.3d at 1355, n. 6 (rejecting defendant's categorical argument "that the transfers [could] not be avoided as [actually] fraudulent because no creditor was harmed"; recognizing that avoidance may lie "even though creditors are merely hindered or delayed"; and in any event rejecting argument because record had uncontroverted evidence of "substantial equity" in properties transferred). Toward the same end but in a different light, this argument is an attempt to snake a complex of difficult issues back into controversy after it was tabled indefinitely under the case management for this adversary proceeding: the value of the Polaroid Corporation's assets, including intellectual property rights. In any event, the argument fails on its own shortsightedness. It does not recognize that granting a first-priority security interest in the unencumbered half of the only significant assets of a company, in the midst of a difficult operational transition, left preexisting creditors of that company grossly hampered in the potential realization on their claims, *in and of itself*. (As noted earlier, and as disclosed via reportage on litigation, the other country-specific trademark rights of the Polaroid Corporation had already been pledged in favor of Acorn Capital Management, a different lender into PCI that was already pressing its claims.) At best, the Polaroid Corporation's own creditors would now have the far more attenuated call of unsecured creditors on the residual cash flow from an operating entity. At worst, they would be left with the dregs of surviving assets, were the two lienors against the trademark rights to enforce their liens and close down the Polaroid Corporation as an operating entity. The Ritchie Defendants' carping is completely beside the point. The notion of a sufficient residuum for Polaroid's own creditors was a fantasy under the conditions that prevailed then, whether that was to be from cash flow from preserved operations or from remaining unsecured assets. Their acceptance of the encumbrance pushed the Polaroid Corporation's own creditors far out to the margins, and probably over the edge. In rhetorical fashion, the Trustee accuses Thane Ritchie of having the strategy in mid-September to rush in and grab the encumbered trademarks as soon as the Ritchie Defendants could. That might not have been the case; there is no clear evidence to that effect. But there is no doubt that the collateral structure he finally squeezed from Tom Petters enabled them to attempt that, as soon as they did try. Their reliance on a cold and abstracted notion of balance-sheet solvency completely elides the contemporaneous condition of the Polaroid Corporation—veering, as it was, between momentary operational insolvency and bare currency on only its most recent expense obligations. With a downfall as likely as it was in an objective sense, the Ritchie Defendants have no real support in this notion—for either intent-based fact question at bar.

The undisputed facts properly trigger the Ponzi scheme presumption for the Polaroid Corporation's encumbrance of the trademark rights in favor of the Ritchie Defendants. There is no direct, probative, admissible evidence to defeat the powerful inference that makes out the one key fact—that the pledge was made in furtherance of the scheme. Because the presumption then dictates a finding that the transfer was made with intent to hinder, delay, or defraud the Polaroid Corporation's creditors, and because the Ritchie Defendants have brought forward no probative, admissible evidence of sufficient weight to rebut the presumption, the grant of security interest is avoidable under 11 U.S.C. § 548(a)(1)(A).

2. *Application of State Law with Use of Presumption: Minn.Stat. § 513.44(a)(1).*

■ The Minnesota enactment of the Uniform Fraudulent Transfer Act has a provision that is functionally identical to § 548(a)(1)(A), Minn.Stat. § 513.44(a)(1).[44] In the Eighth Circuit, corollary provisions in the federal and state law that address intentionally-fraudulent transfers receive the same construction and application. *In re Graven,* 936 F.2d 378, 383 (8th Cir.1991) (Uniform Fraudulent Conveyance Act and § 548(a)(1) use "the same standard"); *In re Graven,* 64 F.3d 453 (8th Cir.1995); *In re Craig,* 144 F.3d at 593 (Congress intended to bring federal bankruptcy law of fraudulent transfers into conformity with analogous state law); *In re Sherman,* 67 F.3d at 1353. Absent a contrary judicial application or an express prohibition in

state law, there is no reason not to harmonize the construction in the other direction, in the context of a bankruptcy case.[45]

■ It is simple, then: the corollary provision of Minn.Stat. § 513.44(a)(1) furnishes equal authority for the adoption of the Ponzi scheme presumption, as extended under bankruptcy law, for the avoidance of the Ritchie Defendants' liens against the property of the Polaroid Corporation. The grant of security interest may be avoided under Minnesota law, through the empowerment of 11 U.S.C. § 544, as well.

3. *Badges of Fraud Under Federal and State Law: 11 U.S.C. § 548(a)(1)(A) and Minn.Stat. §§ 513.44(a)(1) and 513.44(b).*

■ Apart from the Ponzi scheme presumption, there is an alternate basis for fact-finding as to actual intent in this matter. It also uses a process of inference, on the so-called "badges of fraud" analysis. This tool for adjudication is based on the same near-inevitability in real life, that "proof of actual intent to hinder, delay or defraud creditors may rarely be established by direct evidence." *In re Sherman,* 67 F.3d at 1353. Thus, the law allows "courts [to] infer fraudulent intent from the circumstances surrounding the transfer." *Id.* In such circumstances, legislatures and courts alike have recognized that certain events, acts, and statuses, in some meaningful combination, evidence a transferor's intent to hinder, delay, or de-

---

44. The relevant text of the Minnesota analog is:

 (a) A transfer made ... by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made ..., if the debtor made the transfer ...:

 (1) with actual intent to hinder, delay, or defraud any creditor of the debtor ...

45. There is no extant case law on the point from the Minnesota appellate courts. The Minnesota statute does not bar such a coordinated construction on its face.

fraud its creditors. These factors are termed "badges of fraud." The legislative recognition of the badges in state fraudulent-transfer statutes receives deference from the federal courts, by their incorporation into the application of § 548(a)(1)(A). *Id.*[46]

The Minnesota enactment of the Uniform Fraudulent Transfer Act enumerates various badges of fraud at Minn.Stat. § 513.44(b), "which help to determine actual intent."[47] *Citizens State Bank of Hayfield v. Leth,* 450 N.W.2d 923, 927 (Minn. Ct.App.1990). *See also, generally, U.S. v. Scherping,* 187 F.3d 796, 804–805 (8th Cir. 1999), *cert. den.,* 528 U.S. 1162, 120 S.Ct. 1175, 145 L.Ed.2d 1084 (2000). Some of these factors refer to acts, with reference to the recipient. Most of them focus on the subject debtor's condition or actions. As evidence, all go to the intent of the transferor, which logically is equated to the debtor.[48] Those badges dealing with debts and assets presumptively implicate those of the debtor-transferor. And finally, because the remedy functions to protect creditors of the transferor, courts usually consider the badges dealing with debt as focusing on the debts of the debtor-transferor.

■ When actual-fraud litigation is brought on a debtor's transfers of its own property for the benefit of a related third party, the frame of reference is somewhat different from that usually associated with the statutory badges. However, where the transfer is effected by a person in common control of both, this only requires a read-

justment of the analysis; it does not make the badges of fraud inapplicable. First attention must still be given to the transfer's impact on the debtor-transferor's *own* creditors, in the forms of the debtor's reduced solvency in a balance-sheet sense, its impaired ability to respond to its creditors on an ongoing basis, or the onset of actual insolvency. But where a person in control of a debtor-transferor brings about the transfer to benefit the creditor of a related, commonly-controlled entity, the financial insecurity and the actual or potential insolvency of that third-party entity is more powerful circumstantial evidence of an actual intent to impair the rights of the creditors of the transferor-entity—emanating as it does from the person in common control.

■ Due to the variant context, most of the badges in the Minnesota statute's nonexclusive listing do not lie perfectly on their wording, for this case. Nonetheless, the essence is present.

 *a. Minn.Stat. § 513.44(b)(8): Lack of Reasonably Equivalent Value for Transfer.*

■ In a non-quantified sense the presence or lack of reasonable equivalency between the value transferred and the worth of any consideration received by the debtor is a relevant consideration here, and not only by reference to Minn.Stat. § 513.44(b)(8). The Eighth Circuit has found a badge of fraud in the *gratuitous* transfer of a property interest, without exchange for consideration of value re-

---

46. As a result, the analysis on the factors identified in state statute applies equally to counts pleaded in the alternative by a trustee in bankruptcy. So, a single discussion will suffice for both sources of law, under our circuit's approach.

47. The text of this statute now on the books was enacted in 1987 and has not been amend-

ed. It enumerates 11 acts or circumstances as to which consideration may be given, *among other factors,* in "determining actual intent under [Minn.Stat. § 513.44](a)(1)." (emphasis added). It is not necessary to quote the text's full enumeration here.

48. *See* n. 9, p. 9.

ceived by the debtor-transferor. *In re Bateman*, 646 F.2d 1220, 1222–1223 (8th Cir.1981). In that regard, *the Polaroid Corporation's* transfer to the Ritchie Defendants did not result from or result in the grant of any credit or the payment of any money *to the Polaroid Corporation*. It was entirely a grant of security after the fact, for the preexisting debt of a third party. There is no evidence of any *quantifiable* value received by the Polaroid Corporation for a transfer made expressly for the benefit of that related third party. This is a significant badge of Tom Petters's fraudulent intent to extract value out of the Polaroid Corporation, resulting in detriment to its own creditors.[49]

49. The Ritchie Defendants argue that the corporate finance industry recognizes that value inheres to a subsidiary operating company when it pledges its assets for the debt of its parent holding company. The thought apparently is that interlocking management is given greater strength and stability, which advances the interests of both companies and enhances the likelihood of mutual success in business. The argument ignores the presence of a bedrock definition in the statute itself: " 'value' means *property*, or satisfaction of a present or antecedent debt *of the debtor* ...." 11 U.S.C. § 548(d)(2)(A) (emphasis added). *See In re Richards & Conover Steel Co.*, 267 B.R. 602, 613 (8th Cir. BAP 2001) (for "reasonably equivalent value" inquiry under constructive-fraud theory of avoidance, "value may be the satisfaction of an antecedent debt of the Debtor, but not normally the satisfaction of another party's debt...."). It also ignores a line of local authority, that in the context of fraudulent transfer litigation transfers by a debtor for the primary benefit of a third party must give the debtor an "indirect benefit" that is "fairly concrete" in order for that to be cognizable as "value" in the context of fraudulent transfer litigation. *In re Minnesota Utility Contracting, Inc.*, 110 B.R. 414, 420 (D.Minn. 1990); *In re Jolly's, Inc.*, 188 B.R. 832, 842–843 (Bankr.D.Minn.1995). *See also Stoebner v. Lingenfelter*, 115 F.3d 576, 579 (8th Cir. 1997) (affirming fraudulent-transfer verdict for trustee against recipient of payment from debtor, where payment was applied solely to debt of another company owned by debtor's individual principal and there was no basis in record on which to pierce corporate veil). The defendant raising such a defense has the burden of production of evidence on both the concreteness and the value to the debtor that would stem from the benefit to the third party. *In re Minnesota Utility Contracting, Inc.*, 110 B.R. at 417–419; *In re Richards & Conover Steel Co.*, 267 B.R. at 614 ("The party claiming to have delivered value [via direct benefit to a third party] must quantify it...."). *Cf. In re Bargfrede*, 117 F.3d 1078, 1080 (8th Cir.1997) ("indirect, noneconomic benefit" to debtor from transferring asset to satisfy debt of his spouse, in "form of a release of a possible burden on the marital relationship and the preservation of the family relationship," analogized to "intangible, psychological benefit" that was not reasonably equivalent to value of property transferred, for constructive-fraud analysis). The Ritchie Defendants have not put any evidence into the record to establish the concreteness of the indirect benefit they assert, let alone to quantify it to a dollar-value. More to the point, the whole notion of the "strong parent" theory is laughable in context. All the evidence in the record points to only one conclusion: weeks before the trademark security interests were granted, the jig was up for Tom Petters and his scheme. There was no avenue in sight for further borrowing to take the Ritchie organization out of the PCI/PGW debt structure. The financial markets were locking up and about to plummet, worldwide. The pledge of Polaroid Corporation assets was a measure of utter desperation, without thought to a future only two weeks hence let alone months or years. (One keeps coming back around to the frantic, even terrified, but witless scream of Tom Petters's *ukase* to his subordinates, by e-mail sent on September 4, 2008. *See* Pl.'s Exh. 74 (quoted at Finding 30, pp. 37–38, *supra*)). And, anticipating a cry of foul play by the Ritchie Defendants under the docket administration of this matter: evidence on the contemporaneous value of the Polaroid Corporation's assets or even the subject trademarks is not needed to support this conclusion. The lack of *any* direct consideration to the Polaroid Corporation that is capable of valuation in its own right shifts the initial burden of production on this badge entirely to the Ritchie Defendants. Without any concrete evidence in the record to meet that heavy burden, the Trustee had no burden to develop quantified evidence of his

### b. Minn.Stat. § 513.44(b)(3): Concealment of Transfer.

The disclosure or concealment of the transfer is another statutory badge, Minn. Stat. § 513.44(b)(3). There is no evidence of record that Tom Petters disclosed the encumbrance of the trademarks to any of the Polaroid Corporation's trade creditors, or that there would have been any way for such creditors to learn of the effective subordination of their recourse against the value in some of their debtor's most valuable assets, before the liens were perfected.

Further (though the point is more attenuated), the transfers were certainly concealed from parties that had a stake derivative of the claims of the other (and more significant) class of creditors in the Polaroid Corporation's debt structure. Those unknowing parties were the non-Ritchie creditors of *PCI and PGW*, and not merely such creditors with claims that arose from the Ponzi scheme. PCI and PGW were major unsecured creditors of the Polaroid Corporation under very large booked inter-company lendings. In broad brush, they had a status common with the Polaroid Corporation's trade creditors. The point, however, is that PCI's and PGW's own creditors had every interest in seeing that the Polaroid Corporation made good on its obligations to them under the inter-company grants of credit. This might be done from revenues from an operation enabled by bona fide third-party financing to be secured by the Polaroid Corporation's assets, or it might come from the liquidation of the Polaroid Corporation's still-unencumbered assets in a worst-case scenario. It does not matter which. The point is, with as tight a set of corporate relationships as this, the creditors of PCI and PGW would have wanted to know own on any asset value transferred to the

about what happened to the Polaroid Corporation's most significant assets when their value and availability were as deeply affected as this.

Finally, there is a second way to recognize the interest of that same constituency—the creditors of the Polaroid Corporation's second-level parent, PGW—by looking upstream in the ownership chain. PGW's own creditors would have a valid, generalized expectation that the Polaroid Corporation would remain viable and unencumbered by debt that was not its own obligation, keeping its assets and options unburdened and hence providing a means for PGW to satisfy its own debts from dividends or the sale of equity with value that would be funneled through the intermediate holding company.

The encumbrance of the trademarks in favor of the Ritchie Defendants took significant value, actual and potential, away from all these parties up and down the corporate structure. By the time that any creditor of PCI or PGW could have retrieved a UCC filing against the Polaroid Corporation, it would have lost its chance to protest or to take preemptive action. Tom Petters yielded the senior value in trademarks to the Ritchie Defendants in secret from all who could have looked to the Polaroid Corporation's unencumbered assets. This secrecy is significant circumstantial evidence of his intent to defraud the Polaroid Corporation's creditors.

### c. Minn.Stat. § 513.44(b)(4): Suit, or Threat of Suit.

In material proximity with a challenged transfer, the commencement of suit against the transferor or the threat of suit is a badge of fraud under Minn.Stat. § 513.44(b)(4). *In re Larson*, 245 B.R. 609, 616 (Bankr.D.Minn.2000); *Citizens*

Ritchie Defendants.

*State Bank of Hayfield v. Leth,* 450 N.W.2d at 927. Obviously, this badge stems from the likelihood that a party anticipating a judgment-debtor status will be motivated to shelter its assets from collection by transferring them to a third party.

By late August, 2008, Tom Petters undeniably saw that several parts of his enterprise structure were vulnerable in this way. There was the commencement of the Acorn Capital Management lawsuit; and there was the Ritchie Defendants' barely-veiled threat through attorney Legamaro. Yes, the Polaroid Corporation was not a defendant in the pending action (Acorn's), and would not have been in the threatened one. But that does not matter. The person in common control clearly was scared of the consequences to his whole enterprise structure, long-avoided but imminent. He clearly was willing to do whatever it took to stave off suit from the Ritchie Defendants. It is not material that the transfer was made to mollify a threatening opponent by giving it asset value, rather than spiriting assets away from a successful one. In the end, it led to the same detriment, a prejudice to creditors of the transferor that otherwise would have looked to the assets for their satisfaction.

#### d. Minn.Stat. § 513.44(b)(5): Transfer of "Substantially All" of Transferor's Assets.

The emptying-out of value from a transferor that results from a challenged transfer is another badge, whether in whole or by a substantial portion of the transferor's assets. Minn.Stat. § 513.44(b)(5); *U.S. v. Scherping,* 187 F.3d at 805. Again, the badge is premised on a logical coincidence within human experience: this sort of act is too frequently prompted by a motivation to see that a pressing creditor does not get the assets—whether the goal is to shelter them for later retrieval or not. Between

the earlier pledge to Acorn Capital Management and the one at bar, the Polaroid Corporation transferred its trademark portfolio, probably the most valuable asset it had at the time. At the same time, it gave away most or all of its ready ability to secure any further third-party borrowing in its own right. The magnitude of the total loss to the Polaroid Corporation matches the essence of this badge. *Cf. U.S. v. Scherping,* 187 F.3d at 805 (staged transfer of nearly all of debtor's assets, in separate conveyances, can be badge of fraud under Minn.Stat. § 513.44(b)(5)).

#### e. Transfer Effected by Sole Person in Common Control.

In evaluating actual intent under the badges-of-fraud approach, the court can consider "other [non-enumerated] factors bearing on the issue of fraudulent intent," as a matter of logic and general human experience. *In re Sholdan,* 217 F.3d at 1010. Though none of the badges recited in the Minnesota statute encompass it, it is pivotal here that the transfer was directed and effected at the sole instance of Tom Petters, who held iron control of all of the business entities involved via his 100% ownership, and who had the very most to lose were he not to use the ploy of pledging the trademarks.

#### f. Outcome, on Consideration of Badges Noted.

The last factor clinches it, when tied back to the others: even without the overlaid backdrop of a collapsing Ponzi scheme, these badges cumulate to independently support the inference that Tom Petters was willing to materially impair the interests of the Polaroid Corporation's creditors by encumbering assets otherwise subject to their claims, and was ready to go ahead and do that in mid-September, 2008. This meets the actual-intent requirement under either bankruptcy law or the Minnesota statute. The avoidance of the grant of

liens is thus merited, independently of the Ponzi scheme presumption.

## II. The Ritchie Defendants' Affirmative Defense: Receipt of Security Interests for Value and In Good Faith.

The Trustee has also moved for summary judgment on the one statutory affirmative defense that the Ritchie Defendants raised against all of his fraudulent-transfer theories. This defense entails two fact issues: whether the grant of the trademark security interests was made for value given to the Polaroid Corporation, and whether the Ritchie Defendants acted in good faith in receiving them. The defense is recognized under both statutes invoked by the Trustee: the federal, at 11 U.S.C. § 548(c),[50] and the state, at Minn. Stat. §§ 513.48(a) and (d).[51] With the exception of one qualifying adjective that does not come into play here, the language of the statutes is indistinguishable in application.

### A. Fact–Finding as to Transferee's Good Faith, Under Judicial Construction of Applicable Statutes.

As to the good-faith element, the inquiry once again goes to a state of mind. This time, it is on the part of the transferee. Direct proof is again relatively rare; so the appellate courts have authorized fact-finding based on the sort of objective evidence that is more likely forthcoming. They permit the ultimate intent to be deemed on findings of the right sort-recog-nizing the conclusions that any rational participant in such a transaction would reach on learning of such circumstances.

 The governing precedent plays out that way, as follows. The Eighth Circuit recognizes that good faith under § 548(c) "is not susceptible of precise definition and is determined on a case-by-case basis." *In re Sherman,* 67 F.3d at 1355. Even though the focus of the inquiry is "subjective" in a connotative sense, "courts look to what the transferee objectively knew or should have known instead of examining the transferee's actual knowledge from a subjective standpoint." *Id.* (quoting *In re Agric. Research & Tech. Group, Inc.,* 916 F.2d 528, 535–536 (9th Cir.1990) (interior quotations omitted)). "In other words, a transferee does not act in good faith when he has sufficient knowledge to place him on inquiry notice of the debtor's possible insolvency." *Id. See also In re Armstrong,* 285 F.3d 1092, 1096 (8th Cir.2002) (reiterating that inquiry over transferee's knowledge or notice goes to insolvency of debtor-transferor, as ultimate subject); *In re Grueneich,* 400 B.R. 688, 693–694 (8th Cir. BAP 2009).

In a way, this analysis circles back in part to the transferor's actual intent in relation to its own creditors, as the key to the threshold claim for avoidance: "to determine whether good faith exists, the court looks to whether the transaction carries the earmarks of an arms-length bar-

---

**50.** With an exception not applicable here, this statute provides, in pertinent part:

> ... a transferee ... of such a transfer ... that takes for value and in good faith has a lien on or may retain any interest transferred or may enforce any obligation incurred, as the case may be, to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer ...

**51.** These statutes dovetail with each other. They provide in pertinent part:

> (a) A transfer or obligation is not voidable under [Minn.Stat. § ] 513.44(a)(1) against a person who took in good faith and for a reasonably equivalent value ...
>
> ....
>
> (d) Notwithstanding voidability of a transfer ... under [Minn.Stat. §§ ] 513.41 to 513.51, a good-faith transferee or obligee is entitled, to the extent of the value given the debtor for the transfer ...
>
> (1) ... a right to retain any interest in the asset transferred ...

gain." *In re Sherman*, 67 F.3d at 1355 (citation and interior quotes omitted). The status of an arms-length bargain places the justifiability of the transfer and its terms against another sort of objective standard.

Oddly, there does not seem to be any published construction of the "good-faith-purchaser-for-value" defense from the Minnesota state appellate courts, under the local enactments of the Uniform Fraudulent Transfer Act and its predecessor, the Uniform Fraudulent Conveyance Act.[52] In the absence of that, the federal interpretation of the remedies in bankruptcy should be taken as the most likely approach that the Minnesota state courts would adopt. Harmonizing the construction of cognate legislation is as appropriate for the defenses as it is for the main remedy.

**B.** *Good Faith or Lack Thereof, on the Part of the Ritchie Defendants, in Receiving the Security Interests.*

The application of the federal-law precedent must contend with the skewed alignment of the participants' interests, which again was somewhat different from that understood for the Eighth Circuit's original framing of the defense. The question is the relative "goodness" of the Ritchie Defendants' "faith" in extracting value from an entity that was not its debtor, via a pledge of that company's assets for the debt of another. The event of transfer and its involved history are the same; but a heavy cleaver must be applied to identify the determinative facts and circumstances that are relevant to an objectively-driven process of inference.

In this regard, neither side's presentations were tight enough in their theory. Both sides wandered astray in the way they weighted basic facts. The Trustee based too much of his argument on the *terms* of the Ritchie entities' *original lending to PCI and its related entities,* which he repeatedly impugned as exploitive and even predatory. However, those transactions were only backdrop to the transfer to be subjected to avoidance, an extraction of value *from the Polaroid Corporation.* On the other hand, the Ritchie Defendants disputed the Trustee's right to summary judgment by culling isolated disputes of fact from the fruits of discovery. But, none of those points are truly outcome-determinative of the issue of fact that goes to an essential element of their defense, under the governing precedent.[53]

In the end, those circumstances indisputably known to Thane Ritchie before the grant of the security interests, objectively manifested to him, compel only one inference on the central fact question for this affirmative defense.[54] The following are

---

52. The defense itself was a feature of Minnesota common-law jurisprudence long before the modern legislation. *E.g., Leqve v. Smith*, 63 Minn. 24, 65 N.W. 121 (1895); *Sonstiby v. Keeley*, 11 F. 578 (C.C.D.Minn.1882); *Thompson v. Bickford*, 19 Minn. 17 (1872).

53. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (materiality of facts at issue for summary judgment depends on whether they are outcome-determinative under governing substantive law).

54. Just as all decision, direction, and action on the part of PCI, PGW, and the Polaroid Corporation was by the will of Tom Petters alone, so too were all of the Ritchie Defendants' decisions, directions, and actions at the order of Thane Ritchie alone. The whole history was propelled by two high-powered, "Mr. Big" types—both of whom relegated the details to their "people," but who held and wielded total control over the final decisions to commit their respective companies. This is why Thane Ritchie's knowledge and intent are just as attributable to all of the Ritchie Defendants as Tom Petters's is to all of the corporate entities on the other side.

the uncontroverted facts going to that.[55]

### 1. Ritchie Entities' Original Lending to PCI, PGW, and Tom Petters: Backdrop, Due Diligence, and Reliance.

38. The 2008 lending was not the first contact between the Ritchie entities and the Petters enterprise structure. In 2002, the Ritchie entities first evaluated the prospect of lending to or investing in the Lancelot Funds, which had been providing financing to PCI for its ostensible operations. Pl.'s Exh. 41 (Ritchie depo. tr.), at 67–69. In addition, Thane Ritchie had considered lending to the Polaroid Corporation in 2005. *Id.* at 22–25, 67–69. Neither effort resulted in direct lending from the Ritchie entities to any company in the Petters enterprise structure, including the Polaroid Corporation. *Id.* at 22–25, 42–43, 67–69.

39. In 2002, the Ritchie entities had engaged one Jeff Nason for investigation in connection with a possible lending to the Petters enterprises or to the Lancelot Funds. *Id.* at 67–68. Nason is an "independent consultant" in finance, but he had formerly been employed by the accounting firm of Coopers & Lybrand. *Id.* at 68. In 2005, when reviewing the possible deal with Polaroid, the Ritchie entities hired "somebody" who "dug into the balance sheet [of the Polaroid Corporation] and the value of Polaroid at the time," for the Ritchie entities, "estimating its value of over a billion dollars." *Id.* at 67–68.

40. However, the Ritchie entities did not engage Nason or anyone else in 2008, for any purpose in connection with the lending or investment initially proposed by George Johnson at Capital Financial Advisors, LLC. *Id.* (admitting that the Ritchie entities relied on the previous "due diligence").

41. In 2008, the Ritchie entities' personnel considered only two sources of information for the Petters enterprise structure and the Polaroid Corporation, to evaluate the lendings that were to begin at the beginning of February:

 a. materials prepared or given by third parties at that time, which consisted of a letter from Northern Trust attesting that Tom Petters "was in high standing," Pl.'s Exh. 41 (Ritchie depo. tr.), at 69, 114; and

 b. materials prepared within the Petters enterprise structure, provided by Camille Chee–Awai to Thane Ritchie on February 1, 2008, which consisted of:

 i. a *draft* of financial statements for the Polaroid Corporation for 2006, prepared internally for purposes of an audit that may not have been held;

 ii. a report on the Polaroid Corporation's financial performance as of November 30, 2007, generated internally and sent to creditor J.P. Morgan; and

 iii. a "report" by Duff & Phelps that evaluated the Polaroid brand, prepared for some other purpose and for some other party; and

 iv. a "summary of historical financials and capital structure of Polaroid."

Pl.'s Exh. 51 (E-mail from Camille Chee–Awai to Thane Ritchie (2/1/08)) [Filed under seal at Dkt. No. 70]; Pl.'s Exh. 41 (Ritchie depo. tr.), at 69.

42. The Ritchie entities never received audited financial statements or any other form of source-checked or verified report for the Polaroid Corporation, before they advanced the full amount of their lending

---

**55.** For the sake of anyone reviewing the sense of this decision, the numbering is sequential to that applied to earlier treatments of the other major issues.

to the PCI/PGW note debtors. That lack was not a "big concern" for Thane Ritchie. Pl.'s Exh. 103 (Transcript of deposition of Thane Ritchie (5/25/10)) [Dkt. No. 103], at 60–61.

43. Wappler asked James Wehmhoff for a personal balance sheet and other personal financial information for Tom Petters; but the Ritchie entities never received any of it. Wappler himself did not pursue these materials because "as an associate at Ritchie Capital, [he was] taking a lot of direction from above;" and he was not tasked to be "solely responsible for all diligence around this." Wappler could not explain "why Ritchie as a group didn't decide to pursue that further." Pl.'s Exh. 104 (Transcript of deposition of John Wappler (5/21/10)) [Dkt. No. 103], at 58–59.

44. Neither Wappler nor any other Ritchie personnel ever contacted an ostensible customer of PCI's diverting business, to verify that PCI was transacting and generating revenues as represented to the Ritchie entities. All Ritchie personnel yielded to Tom Petters's blandishment that the diverting business entailed utter secrecy as a prevailing norm, and that this sensitivity prevented PCI from allowing lenders to obtain such verification as a part of their due diligence. Pl.'s Exh. 49 (Wappler depo. tr.), at 45. The Ritchie entities never second-guessed Tom Petters's statement as to the need for such secrecy. There is no evidence in the record to establish that this was an industry norm.[56]

45. The possibility of imposing contractual restrictions on the use of lent funds was discussed. However, the Ritchie entities' personnel relied on Tom Petters's blandishment that "it would really screw up [PCI's] business if we put a lot of restrictions on the loans." Pl.'s Exh. 41 (Ritchie depo. tr.), at 75–76. Thus, the Note Purchase Agreement expressly gave the borrowers in the Petters enterprise "sole discretion" as to the use of funds lent. Pl.'s Exh. 27 (Note Purchase Agreement), § 1.3.[57] In "not really hav[ing] an issue" with these terms, Thane Ritchie and his companies' personnel relied in a broad way on "the collateral [being] good." Pl.'s Exh. 41 (Ritchie depo. tr.), at 75–76. A lien against the equity shareholding in the Polaroid Corporation was the only "collateral" in discussion at that point.

46. One and two days after Thane Ritchie had the first 31 million dollar advance wired to PCI, he and other personnel of the Ritchie entities had various concerns about the possible risks in a larger lending to PCI that would be secured by Polaroid Corporation's stock, and discussed them among themselves:

a. On February 2, 2008, Thane Ritchie referred the matter to John Kermath for his evaluation, stating that Polaroid "looks like a good brand but they are not making money and space may be tougher going forward ..." Pl.'s Exh. 48 (E-mail chain among Thane Ritchie, John Kermath, and others) [Filed under seal at Dkt. No. 70].

b. Later on February 2, 2008, Wappler opined back to Thane Ritchie

---

56. The Ritchie Defendants cite the testimony of Robert D. White, one of the convicted codefendants of Tom Petters, to make out such an industry norm. *See* Defs.' Exh. 73 (Partial transcript of deposition of Robert D. White (July 27, 2010)) [Dkt. No. 85], at 234–236, 250–251. However, the Ritchie Defendants have never purported to qualify White as an expert in the diverting industry and his statements cannot carry preponderating weight.

57. In retrospect, the purpose and contemplated effect of this provision is a mystery. All of the money had already been advanced, with no strings either oral or written. And all of the money was already gone.

and others that a "revolver" in favor of J.P. Morgan already had "first lien on all assets" of the Polaroid Corporation, with the 209 million dollars' worth of remaining debt on the books of the Polaroid Corporation being "basically Petters in some form or fashion," i.e., intercompany debts to PCI or others in the Petters enterprise structure, "all subordinated to the [J.P. Morgan] revolver ..." Wappler's bottom-line conclusion was that "90% of the debt is Petters, but the pledged stock [in the Polaroid Corporation] would be still subordinated to the debt payments ..." Pl.'s Exh. 50 (E-mail chain among John Wappler, Thane Ritchie, and others) [Filed under seal at Dkt. No. 70].

c. Kermath then opined, by e-mail, to Thane Ritchie and others, on February 3, 2008: "Still thinking through the issue of lending money to the sponsor against company stock where the key lender to the company is the sponsor (and has a demand note). Pretty unusual. At first blush, with $31MM loan outstanding I'm not worried. At $100MM, I'm more worried and we are in a stretched position." Pl.'s Exh. 51 (E-mail chain among John Kermath, Thane Ritchie, and others) [Filed under seal at Dkt. No. 70].

d. Later on February 3, 2008, John Wappler sent an email to Thane Ritchie and others directing their attention to severe liquidity and cashflow concerns in the past: "According to the 2006 financial statements, Polaroid broke some covenants on the revolver in 2006 and entered a forebearance agreement with the lenders, reducing the maximum borrowing limit to $145MM." *Id.*

47. But then the next day, February 4, 2008, Thane Ritchie replied to Kermath and the others, "[n]othing usual about this deal including the IRR!!—need to make sure we get the pledge against Pol all lined up this week—standstill or first right o[sic] refusal makes sense." *Id.*

48. Thane Ritchie's reference apparently was to the "*I*nternal *R*ate of *R*eturn." On the ten promissory notes executed by Tom Petters on February 19, 2008, the stated annual interest rate was 80%. Pl.'s Exh. 54 (Ritchie–PGW/Petters promissory notes).

49. In Kermath's estimation at the time, this interest rate was greatly out of the ordinary for the Ritchie entities' operations. He could not think of another lending on the portfolio that bore such a high rate of interest. Pl.'s Exh. 31 (Kermath depo. tr.), at 78–79. Two years after the fact, Kermath opined that the rate was a reflection of "huge liquidity issues or systemic issues that were beginning to be apparent" in the general financial markets at the time, with "[b]anks ... pulling back in loans at the time." *Id.* at 68–69 and 78.

50. Tom Petters told Thane Ritchie "right up front" that the Petters enterprise would use the Ritchie entities' advances to pay off earlier hedge-fund lenders. Pl.'s Exh. 8 (Petters testimony tr.), at 3045.[58] In addition, Deanna Coleman prepared and provided a spread sheet to the Ritchie entities, which recited an itemization of payments to prior creditors from the funds that the Ritchie entities had lent

---

**58.** The Ritchie Defendants have produced no evidence to counter this statement, made under oath by Tom Petters himself.

into the Petters enterprise structure. Pl.'s Exh. 6 (Coleman depo. tr.), at 92.[59] By June, 2008 at the latest, the Ritchie entities had received direct notice from the Petters enterprises that PCI had used all of the Ritchie cash infusions to pay preexisting creditors. Pl.'s Exh. 49 (Wappler depo. tr.), at 46–47, 154–155; Pl.'s Exh. 6 (Coleman depo. tr.), at 92–94, 99–100, 220–229; Pl.'s Exh. 67 (E-mail from Deanna Coleman to Tom Petters) (6/30/08) [Dkt. No. 65]; *see generally* Pl.'s Exh. 68 (E-mail chain among Wapper, Coleman, and others).

2. *The Polaroid Corporation's Grant of Security Interests: Ritchie Entities' Final Push and Circumstances Surrounding Grant.*

51. After Thane Ritchie learned of the Acorn Capital Management lawsuit against PCI in early August, he put much stronger pressure on Tom Petters to formalize and finalize a grant of collateral security to the Ritchie Defendants. He was very concerned about the allegations that the Polaroid Corporation had already pledged intellectual property rights to Acorn. Pl.'s Exh. 41 (Ritchie depo. tr.), at 152–153. At that time, an outside attorney for the Ritchie entities evaluated his clients' options for taking such security. He expressed serious doubts about the practical value of any security taken through the Polaroid Corporation. He concluded preliminarily that existing liens in favor of the Acorn group would leave a lien to the Ritchie entities "subordinated entirely." He expressly envisioned a scenario: ". . . unless Acorn is gone in its entirety, Polaroid is near insolvency and the grant of any collateral to us would appear meaningless.

Am I missing something?" Pl.'s Exh. 76 (E-mail chain among Legamaro, Root, and others). After viewing the Acorn security interest, the same lawyer opined: "Confirming my point. The Polaroid collateral is not available and not at all acceptable." *Id.*

52. By early September, 2008, the Ritchie entities had broached the prospect that Tom Petters and the PCI/PGW enterprise structure were insolvent. The parties and their attorneys were intentionally structuring their negotiations in light of the possibility. Pl.'s Exh. 30 (Root depo. tr.), at 173–174. In particular, they were contemplating that an extended due date on the promissory notes be fixed at least 90 days after a grant of lien to secure them, in light of possible litigation to avoid the grant of lien as a preference under bankruptcy law. *Id.* at 174.

53. By September 15–16, 2008, Thane Ritchie and Tom Petters were dealing directly with each other on a complex of issues: the defaulted status of the promissory notes; the Ritchie entities' right to call them due immediately; the Ritchie entities' demands for collateral security; and the contemporaneous onslaught by demands from Lancelot Investors Fund and its affiliates, which held even larger claims against PCI and the other Petters entities. Their communications on those days evidence that both men were getting frantic:

a. First, Thane Ritchie wrote to Tom Petters: "Please call tonight—we need to finalize our loans or it will be a mess—this is a real issue!!!—i left you a voice mail earlier!!!"

---

59. Per Coleman, this spreadsheet was either incomplete or inaccurate—because it did not reflect payments of Ritchie-lent funds that were paid to Tom Petters personally for his own use; money paid over to Sun Country Airlines for its own use; or money applied to payroll for PGW's employees. Coleman, as Vice President of Operations at PCI, was one of the people most closely involved in the receipt and disbursement of monies lent into the Petters enterprise structure.

Pl.'s Exh. 78 (E-mail chain between Thane Ritchie and Tom Petters).

b. Tom Petters responded: "I will call at a dinner trying to squeeze money from melon [sic] bank!!!" *Id.*

c. Reiterating his first e-mail, Thane Ritchie shot back: "Please call tonight—we need to finalize our loans or it will be a mess—this is a real issue!!! . . . Also meeting greg bell tomorrow to help him and want to follow up on other short term issues." *Id.*

d. Later that night, Tom Petters lamented: "Can't sleep well tonight . . . I am very upset and full of anxiety. I cannot make this whole thing go down. I must treat all as fairly as I know how. Please see what you can do to help Greg [Bell] raise dollars. Also know that we must both do the right things." *Id.*

e. Thane Ritchie responded to Tom Petters with words of encouragement, albeit with the same amount of urgency: "Hang tough—we will get through this—lets get docs signed—i will handle greg—maybe i can fly down wed or meet fri—lets discuss dycal [sic] deal today." *Id.*

54. On September 18, 2008, Thane Ritchie told Tom Petters, via e-mail, that "this will get messy without an agreement in place today." He expressed his concern that Greg Bell, on behalf of the Lancelot entities, was "grabbing value from both of us." He complained that Bell didn't "understand" that the Ritchie entities had been "last money in and should be first out."[60] Pl.'s Exh. 79 (E-mail from Ritchie to Petters).

55. After that:

a. Tom Petters and Thane Ritchie executed the Extension Agreement and the Trademark Security Agreement on September 19, 2008. Pl.'s Exh. 36 (Extension and Amendment Agreement).

b. On that very date, per Mary Jeffries, the Polaroid Corporation was unable to meet its regular accounts payable when due. Pl.'s Exh. 83 (Partial rough transcript of deposition of Mary Jeffries (9/30/10)) [Dkt. No. 65], at 60.

c. On September 19, 2008, Tom Petters, PGW, Thane Ritchie, and Greg Bell as manager of Lancelot Investment Management, LLC, agreed on terms for a joint pledge agreement under which Petters Capital, LLC (the Lancelot SPE) gave the Ritchie entities a security interest in certain inter-company obligations of the Polaroid Corporation to PGW under preexisting promissory notes. This was given as further security for PGW's liability to the Ritchie entities that originated with the promissory note. Defs.' Exh. 53 (Agreement Regarding Pledge of Thousand Lakes Shares and Related Matters) [Filed under seal at Dkt. No. 96].

d. The FBI conducted its search on September 24, 2008. Pl.'s Exh. 11 (Application and Affidavit for Search Warrant).

e. Later on September 24, 2008, PGW issued a press release acknowledging the search of the Petters enterprise's headquarters by the FBI, the Internal Revenue Service, and the Minnetonka, Minnesota Police

**60.** The specific meaning of the references to the actions of Bell and the Lancelot entities is not clear from the record. However, the point is that Tom Petters and his enterprise structure were under siege by most of their very largest creditors at the same time, on all fronts. That is undisputed, as fact, from the record.

Department. Exh. 81 (Letter from Ritchie Capital Management, LLC and others to Tom Petters, PGW, and PCI (9/26/08)) [Dkt. No. 65] (acknowledging existence of press release).

f. On September 25, 2008, Thane Ritchie, Wappler, and Tom Petters met at a party being held in Tom Petters's aircraft hangar. Tom Petters signed the inter-creditor and security agreement contemplated by the terms reached on September 19. Pl.'s Exh. 41 (Ritchie depo. tr.), at 147; Pl.'s Exh. 80 (Security and Inter-creditor Agreement).

3. *Only Possible Inferences on Basic Facts: No Value Received by Polaroid Corporation, and Lack of Good Faith on Part of Ritchie Defendants.*

■■■■ As noted earlier, to avail themselves of the defense to avoidance at the Trustee's instance, the Ritchie Defendants must prove two elements: that they took the trademark security interests for value given to the Polaroid Corporation, and that they acted in good faith in receiving them. 11 U.S.C. § 548(c); Minn.Stat. §§ 513.48(a) and (d). The Ritchie Defendants have the burden of production of evidence on both of these elements. *Stoebner v. Lingenfelter*, 115 F.3d at 579 (holding that defendant in action under 11 U.S.C. §§ 544 and 548 "failed to carry the substantial burden necessary ... on his 'good faith for value' defense"); *In re Grueneich*, 400 B.R. at 693.

Taking a page from *Celotex Corp. v. Catrett*, 477 U.S. at 322, 106 S.Ct. 2548, the Trustee makes a preemptive challenge to the Ritchie Defendants' ability to do so. He maintains that all of the extant, basic evidence on both elements of the affirmative defense goes only one way, i.e., that it cannot sustain findings to make out either

element for the proponents of the defense. He is correct.

In the first place, the record cannot support a finding that the Polaroid Corporation received cognizable "value," in the sense of something concrete, quantifiable, and reducible to equivalent dollars, when its assets were pledged over the misgivings of its own management for debt owing in part by its second-level parent company.

■■■■ The ascertainment of value in this context should be done in an objective sense, with reference first to the marketplace, and it must reverberate against the definition in 11 U.S.C. § 548(d)(2)(A):

In this section—

(A) "value" means property, or satisfaction or securing of a present or antecedent debt of the debtor, but does not include an unperformed promise to furnish support to the debtor or to a relative of the debtor;

. . .

By this very definition, any consideration going toward satisfying a debt must be toward a debt *of the debtor in bankruptcy,* to constitute "value" in itself. *In re Richards & Conover Steel Co.,* 267 B.R. at 612 (applying statutory definition of "value" to analysis of "reasonably equivalent value" under 11 U.S.C. § 548(a)(1)(B)). If an indirect benefit to the debtor derived from the satisfaction of the debt of another is offered in defense as the "value," it must be "fairly concrete." *In re Minn. Util. Contracting, Inc.,* 110 B.R. 414, 420 (D.Minn.1990). The party claiming to have delivered such value must quantify it, as to the debtor. *In re Southern Health Care of Ark., Inc.,* 309 B.R. 314, 319–320 (8th Cir. BAP 2004); *In re Richards & Conover Steel Co.,* 267 B.R. at 614.

Toward this point, the receipt of "fairly concrete" value, the Ritchie Defendants offer no more than the "importance to

[the] Polaroid [Corporation] that PGW remain a viable parent company," "with respect to [the] Polaroid Company's ability to secure needed financing...." Defs.' Opp'n at 41. In the context of the actual, contemporaneous conditions, the notion is laughable.

PGW and Tom Petters's other companies were *not* finding financing for themselves, let alone for the Polaroid Corporation—hence their huge difficulties with the Ritchie Defendants. And it is striking that the Ritchie Defendants were fully on notice of that. At the same time, the Ritchie Defendants strongly suspected that the reasons for those difficulties pierced far more closely to their own situation; it was not just the general condition of the financial markets. The prospect of insolvency up and down the Petters enterprise structure was a point of open discussion across these parties, before the grant of the security interests. In such near-crisis conditions, there was no way to quantify the indirect benefit to the Polaroid Corporation from maintaining PGW against a default to the Ritchie Defendants. It was rapidly becoming a matter of "every company for itself," with each entity's interests to be considered in strict isolation, for the purposes of a determination of value in retrospect. *See generally In re Jolly's, Inc.*, 188 B.R. at 844–845.

■■■ The Ritchie Defendants have failed their burden as proponents of their affirmative defense, as to its requirement of "value" received.[61] Their resistance to the Trustee's motion would fail on that element alone.

To like effect, the evidence of record could not support a finding that the Ritchie Defendants acted in good faith in receiving the trademark security interests.

In the end-stages of the events, the Ritchie Defendants may have rationalized their resort to a direct lien against the Polaroid Corporation's assets as a matter of just desserts: that is, the main brunt of their taking a secured position against the trademarks would fall on the Ritchie Defendants' own debtors—PCI and the other Petters-related entities—even though such a security interest would functionally prime a claim in their favor over those of all of the Polaroid Corporation's own unsecured creditors. The premise for this rationalization would be the heavy presence of intercompany liabilities to PCI and the other Petters-related entities in the Polaroid Corporation's preexisting debt structure. Those parties' claims would represent the bulk of value to be functionally subordinated by the attachment of a lien.

But, by the late summer of 2008, the Ritchie entities' personnel and their attorneys expressly recognized that the Petters enterprise structure and its component entities might well be insolvent themselves, burdened by heavy debt to their own cred-

---

**61.** The case law citations in this discussion are from constructions of the statute formerly codified at 11 U.S.C. § 548(a)(2) (now § 548(a)(1)(B)). This is the Code's provision governing constructively-fraudulent transfers. That statute requires a consideration of whether "reasonably equivalent value" was received by the debtor-transferor in consideration for its transfer. This is a different statute, the application of which has been deferred in this litigation; but that does not render these decisions' analysis irrelevant. As noted, the existence of "value" is the threshold issue under either statute, and that term is statutorily defined at § 548(d)(2)(A). So whether specifically articulated or not, those courts first had to pass on the existence of "value," and then proceed to its reasonable equivalence on both sides of a transfer. The notion of requiring concreteness and quantifiability goes to the threshold existence of value that would be cognizable for the later stage of constructive-fraud analysis. These courts addressed the existence of "value" as a necessary matter, whether they set it out as a separate step or not.

itors. There is no evidence of record that the Ritchie entities' personnel knew the identity of those creditors, or the nature of their claims. But, in context it is not necessary for the Trustee to prove that they knew, or even suspected, that these creditors were the victims of a PCI-purveyed Ponzi scheme, as a prerequisite to countering their assertion of the good-faith defense. The Trustee only had to prove that the Ritchie entities knew of the circumstances of *the Polaroid Corporation's* insolvency or severe financial distress. The recognition would follow directly after that, by logical progression to anyone involved in secured finance: the Ritchie entities' receipt of a transfer of valuable property rights from the Polaroid Corporation, in the form of liens, would shove *that grantor's* creditors aside from any recovery of the corresponding value. The Trustee has produced unrebutted evidence of that notice; and the inference of the awareness of the consequence follows, without evidentiary rebuttal by the Ritchie Defendants. This is sufficient to bar a finding for them on their conclusory assertion of good faith; and that conclusory assertion is all that they present as a prima facie case for this element.

The Trustee's case for summary judgment is only strengthened by his unrebutted proof of an additional sort of knowledge and notice to the Ritchie Defendants contemporaneous with the grant of the trademark security interests: the distinct possibility that PCI, PGW, and their related entities were insolvent in August, 2008. The Ritchie entities gained this more specific knowledge months after they first were told, and believed, that PCI was engaged in the diverting business, with leverage provided by multiple other parties. It is also significant that the debt had been contracted as very short-term obligations, reflecting all sides' assumption that the note debtors would have the means shortly after their original receipt of the advances. From the PCI/PGW note debtors' subsequent nonperformance, the Ritchie Defendants were amply aware that they lacked the means to repay as originally scheduled and for months afterward. The presence of claims in favor of the PCI/PGW enterprise structure within the Polaroid Corporation's debt structure portended large prejudice to the creditors of PCI, PGW, and their related entities, due to the conduit effect of that presence: the Petters-related entities could look to the Polaroid Corporation for repayment of the intercompany liabilities to them, and in turn the creditors of the Petters-related entities would look to that recovery of value for the satisfaction of their own claims.

The Ritchie entities had direct knowledge of this second-level financial distress. That knowledge erodes any remnant credibility in their assertion of good faith in the way they extracted the trademark security interests from an entity that was not even their own debtor.

Finally, there is the alternate consideration suggested by the Eighth Circuit in *Armstrong:* whether the transfer objectively qualifies as an incident of an arms-length transaction. Under that inquiry, the good faith element turns on the externally-manifested fairness-and-squareness of the transfer, to transferee and transferor alike. In large part, this turns on a reasonable matching of value and benefit given and value and benefit received—as would be acceptable generally to reasonable participants in the open market. *Sherman,* 67 F.3d at 1350 (holding that transfer of certain properties "did not bear the earmarks of an arms-length transaction" because purchase price did not correspond with properties' "fair market values").

Under that articulation of an arms-length transaction, the Ritchie Defendants' claim to good faith evaporates. The Polaroid Corporation was a separate entity under law. It had its direct obligations to its own contractual creditors, and it had no payment obligations to the Ritchie entities. Even while its all-controlling shareholder was acting to encumber its assets, surreptitiously and by fiat, the Polaroid Corporation had those preexisting unsecured obligations of payment. Its interests as a functioning corporation suffered by the encumbrance; the attachment extracted that value out of the company and away from its creditors. Any reasonably-acting separate management of a corporation in a like posture would resolve to resist such a destructive measure, whether its holding company is financially distressed or not. The Polaroid Corporation's own CEO, Mary Jeffries, did object to Tom Petters's actions; they promised to destroy any ability to get outside financing for the Polaroid Corporation, in a market that was rapidly contracting anyway. No reasonable CEO in this situation would consider this transfer to be the result of an arms-length transaction among her company, its corporate parent, and a creditor threatening to shut down the parent.

Beyond that, the lack of arms-length character is patent from a different perspective, the genesis of the transfer when made. This was a capitulation by Tom Petters on a measure that he staved off for months, the formal grant of any security. And when he did, he gave security in a form that had a direct effect on the Polaroid Corporation's own creditors. The originally-contemplated form of security would not have had that blunt impact.[62] He granted this enhanced position to the Ritchie entities only in the face of their threats to declare a default against the PCI/PGW note debtors and to take public legal action against them. Being sued promised heavy consequences for PCI's and PGW's own position in the business and financial markets.[63] There could be nothing arms-length about a transfer coming out of such pressure, and made in such desperation.

In the face of the Trustee's evidence, which points only one way, the Ritchie Defendants' evidentiary proffer has no weight at all. To make out value to the Polaroid Corporation (and possibly as evidence of good faith on their part), they rely almost exclusively on a "carveout" provision in the Trademark Security Agreement. This term would have allowed the Polaroid Corporation to obtain up to 75 million dollars in working capital in its own right and to secure it by granting a lien in all of its assets that would be superior to the Ritchie Defendants' security interests. *See* Pl.'s Exh. 37 (Trademark Security Agreement) [Filed under seal at Dkt. No. 69]. But this argument elides the very essence of the provision.

By including this in the deal, the Ritchie Defendants were not *giving* a thing *to the Polaroid Corporation.* The term merely retained to the company a power that it had had in its own right before. The

---

**62.** Foreclosing on a lien against the stock would have made the Ritchie Defendants the shareholders of the Polaroid Corporation. As such, their rights to distribution out of the company's revenues or liquidation would have been subordinate to those of its creditors, under state law.

**63.** As an aside: yes, it is somewhat fatuous to refer to a position in the markets for the Petters enterprise structure, as if there reasonably were one in late August, 2008, and as if Tom Petters could reasonably think he could preserve it. The jig was up, obviously to him, and it is hard to conceive of him having any coherent thought that his facade would survive toward a third-party rescue. But it seems the possibility of holding it together for even one or two days more had its power for him.

Ritchie Defendants insist that the grant of lien "did not hinder Polaroid's ability to obtain working capital financing"; but entirely to the contrary, it had to. Its previously-unrestricted power to encumber its own assets was capped to a dollar value, and the title to those assets was clouded by a lien—junior or senior, it is of no moment—on a debt that was not even its own. This one term is the only aspect of the transfer that is directly traceable to the Polaroid Corporation, and it did not cede any value that the Polaroid Corporation did not have already. With the failure of the gossamer-thin assertion of value in "the strong parent" of PGW, there is no probative evidence of weight from the Ritchie Defendants to make out their affirmative defense, and the Trustee's evidence cuts entirely to the contrary.[64]

The Trustee is entitled to summary judgment on this affirmative defense, whether raised under federal or Minnesota state law. The Ritchie Defendants can neither defeat the prima facie application of the Trustee's avoidance remedy, nor shelter all or part of their lien from its effect.

### III. Disallowance of Ritchie Defendants' Claims in Consequence of Avoidance of Their Liens.

 The Trustee basically seeks to terminate all participation by the Ritchie Defendants as creditor-claimants in the Polaroid Corporation's bankruptcy case, in any capacity whether secured or unsecured. By their very terms, the statutes he invokes are triggered by the avoidance of the Ritchie Defendants' liens under §§ 544 and 548. The Trustee has established his entitlement to that remedy. Given that, and the inherent nature of the Ritchie Defendants' claims as asserted in the underlying case, the Trustee is entitled to summary judgment on these counts as well.[65] This follows from the following considerations:

1. In a more customary grant of avoidance remedies to a trustee against a creditor-claimant, the avoidance of a grant of security interest as a fraudulent or preferential transfer under 11 U.S.C. §§ 544, 547, or 548 would leave the underlying pre-petition unsecured claim against the estate unaffected on its merits. However, for the purposes of entitlement to receive distribution from the bankruptcy estate, the claim must be disallowed "unless such ... transferee has paid the amount, or turned over any such property, for which such transferee is liable under [11 U.S.C. § ] 550...." 11 U.S.C. § 502(d).[66] In other words, the creditor-recipi-

---

64. To the effect that the tender of the carve-out is proffered as evidence of the Ritchie Defendants' good faith, it has no probity or weight either. The measure was at least as much self-service for them; a continuation and strengthening of operations funded by new third-party lending would have greatly bolstered the value of the Ritchie Defendants' lien, even given its potential subordination. This was no gift. More to the point, it was not part of a price either.

65. Neither side paid particular attention to this aspect of the Trustee's motion, in briefing or argument. Nonetheless, it is being subject-

ed to analysis in the same detail as the other counts that were in sharper controversy.

66. Under 11 U.S.C. § 550(a), upon the avoidance of a transfer, "the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property...." The effect of this provision is cumulative to that of 11 U.S.C. § 551, which prevents the underlying asset from reverting to the debtor if the asset is to be recovered and not its value via entry of a money judgment. *In re Arzt*, 252 B.R. 138, 141 (8th Cir. BAP 2000) (under § 551, "once the transfer is avoided, the property that was

ent of an adjudicated avoidable transfer may not benefit from participation in the estate—at least in terms of a possible distribution—before it has made good to the estate, even if its claim is otherwise allowable on its merits. *In re Midwest Agric. Dev. Corp.*, 387 B.R. 580, 585 (8th Cir.2008).

2. After accounting to the estate for its liability, such a creditor-transferee may be allowed a claim commensurate to the amount it pays into the estate. However, any such "claim arising from the recovery of property under ... [§ ] 550 ... shall be determined and shall be allowed ... or disallowed", as provided by 11 U.S.C. §§ 502(a)–(e), "the same as if such claim had arisen before the date of the filing of the [bankruptcy] petition." 11 U.S.C. § 502(h).

3. A pre-petition claim "shall [be] allow[ed] ... except to the extent that ... such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured...." 11 U.S.C. § 502(b)(1). This contemplates determination of the claim on its merits, under nonbankruptcy law. *In re Stevenson Assoc., Inc.*, 777 F.2d 415, 419 (8th Cir.1985) (for purposes of objection to claim against bankruptcy estate under § 502(b)(2), trustee may assert all defenses to which debtor would be entitled).

4. It is undisputed on the record at bar that the Ritchie Defendants never lent money to the Polaroid Corporation; that the Polaroid Corporation did not receive a penny of the money advanced under the notes in question;[67] and that the Polaroid Corporation did not guarantee the debt under the notes. So, the Polaroid Corporation had no pre-petition liability to the Ritchie Defendants under contract or applicable law, on account of the ten notes.

5. Thus, the Ritchie Defendants have no underlying allowable unsecured claim against the bankruptcy estate of the Polaroid Corporation.

6. As a result, any process of a compelled post-avoidance accounting to the estate cannot legally give rise to a newly-allowable claim in favor of the Ritchie Defendants, against the bankruptcy estate of the Polaroid Corporation.

7. In any event, there is nothing for the Ritchie Defendants to do to account to the estate in consequence of avoidance. The trademarks subject to their liens were sold free and clear of those liens during the Chapter 11 phase of the Polaroid Corporation's bankruptcy case; replacement liens in favor of the Ritchie Defendants were impressed against the proceeds of sale to provide ade-

transferred becomes property of the estate....").

**67.** The Ritchie Defendants suggest that some of the Ritchie entities' funds "could have" flowed into the Polaroid Corporation because 25 million dollars of the funds lent to the Petters entities on February 4–5, 2008 went to an SPE associated with an Acorn entity, which in turn lent 15 million dollars to the Polaroid Corporation on February 29, 2009.

Defs.' Opp'n at 35. The suggestion is purely speculative; but more to the point of the summary judgment context, it is unsupported by any probative, direct evidence to controvert the Trustee's evidence on the matter. Martens Affid. ¶ 8; Pl.'s Exh. C (PwC preliminary analysis of Ritchie and Associated Funds Note Payable Detail); Pl.'s Exh. 9 (Jeffries depo. tr.), at 103, 107–108, 245–246.

quate protection under 11 U.S.C. §§ 363(c)(2)(B), 363(f), and 361. With the avoidance of the transfer of the original security interests, that replacement lien is now vitiated and the Ritchie Defendants have no interest in the proceeds held by the estate.

8. Finally—and only in a technical sense—the Ritchie Defendants' lien is cumulatively avoidable under 11 U.S.C. § 506(d), because they hold no allowable unsecured claims against the estate and because the original attachment of their lien is to be avoided under §§ 548 and 544.

## IV. Trustee's Case in Chief: Voiding of Grant of Trademark Security Interests as Unenforceable Due to Failure of Consideration.

Finally, the Trustee moves for summary judgment on an alternate challenge to the trademark security interests, under Count X of his complaint. This theory is framed under Illinois law.[68]

As to the debtor in bankruptcy, the threshold point is that the Polaroid Corporation did not receive any consideration for its grants of lien to the Ritchie Defendants. As a matter of fact, this is already settled on uncontroverted evidence. The Trustee then posits that PCI, PGW, and Tom Petters did not receive any cognizable consideration either. The argument is that the default provisions of the extension agreement were entirely pretextual, because the transaction left the ten notes "callable at will" by the Ritchie entities anyway. This, he says, was due to the de facto existence of non-memorialized, preexisting grounds for a declaration of default, known to both parties when the transaction was executed and which were not excepted from the recitation of events of default under the agreement.

Thus, as the Trustee would have it, the Ritchie Defendants' counter-parties were just as vulnerable as they were before the trademark security interests were given. As corroboration of that, he cites the fact that the Ritchie Defendants called the notes after the FBI raid, only seven days after they executed the extension agreement. This, the Trustee argues, was a failure to forbear for a reasonable time. Thus, as he would have it, the contemporaneous grant of the trademark security interests is unenforceable because the alleged consideration for them—a 90–day extension of the maturity of the notes—was illusory.

The Trustee bases this theory on a number of simple acts and events that are uncontroverted on the evidence of record.

## A. Actions of Polaroid Corporation and Ritchie Entities, Toward Closing the Extension Agreement and the Trademark Security Agreement.

56. As of September 1, 2008, all ten promissory notes were in default. Pl.'s Exh. 54 (Ritchie–PGW/Petters promissory notes); Pl.'s Exh. 33 (Ritchie–PGW/Petters allonges); Defs.' Answer ¶ 34 (admitting that "all of the Notes ... were technically in default as of August 31, 2008....").

57. In August, 2008, Thane Ritchie had confronted Tom Petters about the consequences of the Acorn Funds' federal lawsuit against PCI, for the Polaroid Corporation's ability to give acceptable collateral security on the outstanding debt under the defaulted promissory notes. Pl.'s Exh. 41 (Ritchie depo. tr.), at 152–153.

---

**68.** Under the choice-of-law provisions of the parties' written agreements, the law of Illinois is to be applied to any dispute. See, e.g., Pl.'s Exh. 27 (Note Purchase Agreement), § 8.9.

58. On September 9, 2008, there was an e-mail exchange between David Baer, as in-house counsel for PCI and PGW, and Bill Hobbs, as counsel for the Ritchie entities. The subject was a carveout of the contemporaneous defaults in payment on the notes, from the events that would be specified as defaults under an extension agreement. Defs.' Exh. 55 (E-mail chain among David Baer, Bill Hobbs, and others) [Filed under seal at Dkt. No. 96].

59. Ultimately, on September 19, 2008, PCI, PGW, Tom Petters, and the Ritchie entities executed an extension agreement under which the final maturity dates for all the notes were reset to December 19, 2008. Pl.'s Exh. 36 (Extension and Amendment Agreement), § 3(a)(i). On the same date, Tom Petters executed the Trademark Security Agreement on behalf of the Polaroid Corporation. Pl.'s Exh. 37 (Trademark Security Agreement).

### B. Ritchie Entities' Declaration of Default: Their Attempt to Enforce Their Rights.

60. On September 26, 2008—two days after the FBI executed search warrants at the PCI/PGW corporate headquarters and Tom Petters's residence—the Ritchie entities issued a written notice of default to PCI, PGW, and Tom Petters. Pl.'s Exh. 81 (Letter from Ritchie to PCI, PGW, and Petters). The notice identified the event of default as the occurrence of the FBI raid. Under the notice, the Ritchie entities accelerated the note debtors' obligations and declared all of the notes due and payable immediately. *Id.*

61. The Ritchie Defendants commenced suit against Tom Petters, PGW, and PCI in the Cook County, Illinois Circuit Court. Alleging the default and fraud in the inducement of the original lending, they sought damages, "[p]reliminary and permanent injunctive relief," and "[i]mposition of a constructive trust." Under the rubric of the latter two, they obtained an *ex parte* restraint of any non-ordinary course disposition of the companies' assets. On October 6, they obtained the appointment of a receiver on an *ex parte* basis. He was empowered to seize the Ritchie Defendants' "Collateral" from PCI and PGW and essentially to take over their business operations. On the same day, October 6, the United States District Court for the District of Minnesota appointed a receiver, in a proceeding ancillary to the criminal case that had been commenced against Tom Petters. Within a few days, the Illinois state court deferred entirely to the federal proceedings in Minnesota; it held that the injunction and appointment of a receiver had "expired and [were] of no present effect." Pl.'s Exh. 53 (Complaint in *Ritchie Special Credit Investments, Ltd., et al. v. Petters* (Cir. Ct., Cook County, Ill.)); *In re Petters Co., Inc.*, 401 B.R. 391, 396–398 (Bankr. D.Minn.2009).[69]

### C. Application of Illinois Law to Specific Grounds Cited by Trustee.

■ The Trustee argues that the extension agreement and the trademark security agreement are unenforceable because the structure for the Ritchie entities' forbearance was illusory, and hence there was no consideration for the Polaroid Corporation's third-party pledge. He identifies the contemporaneous pendency of the Acorn funds' litigation as the non-memorialized trigger that was known to all signatories. He says that this event was a breach of the warranty of no material le-

---

**69.** This decision is not part of the formal record for the motion at bar. However, the Ritchie Defendants were active litigants and objectors in the proceeding that led to it; hence, they are bound by its findings.

gal action against the note debtors, at the very time the extension agreement was entered. The Trustee posits that the Ritchie Defendants *could have* declared a default immediately, on this violation of the warranty, and hence the notes were functionally callable at will going forward. Thus, he argues, the Ritchie entities gave no consideration of value to anyone for the considerable value they received via the trademark security interests—with the PCI/PGW note debtors just as vulnerable as they were before, and the Polaroid Corporation now subject to the loss of the newly-liened trademarks. For such want of consideration, he would have the whole works declared unenforceable.

The Trustee does not cite any on-point legal authority for any of the component propositions of this argument. He glosses over the fine points with a summary assertion that the circumstances after the September 19 extension agreement would have made the notes "callable at will." [70] His whole attack on the existence of consideration rests on this hypothetical legal character, with its implication for the practical value of the grant of forbearance. As such, it was incumbent on the Trustee to produce such legal authority.

Not only did the Trustee not do so; the Ritchie Defendants presented a colorable legal argument, founded in case law authority, that it would *not* have had the right to declare default based on the pendency of the Acorn law suit. Hence, as the Ritchie Defendants would have it, the grant of forbearance was otherwise enforceable for the stated period absent another specified event of default.

There is no on-point Illinois case law that articulates its analysis under the rubric framed by the Trustee, i.e., contractual forbearance for a term certain is generally excused by the existence of a non-memorialized but mutually-known incident of default preexisting the contract. However, there is corollary authority that indicates where the Illinois appellate courts would go on the issue. Two decisions of the Illinois Supreme Court hold the parties to the consequences of their knowledge, essentially binding them to a waiver of consequences otherwise to stem from their knowledge, and carving out a preexisting act or condition from the events that otherwise would contractually justify termination on default. *DeLuna v. Burciaga*, 223 Ill.2d 49, 306 Ill.Dec. 136, 857 N.E.2d 229, 249 (2006) (equitable estoppel does not lie where buyer was aware that seller's representations were false); *Wilkinson v. Appleton*, 28 Ill.2d 184, 190 N.E.2d 727, 729–730 (1963) ("For a misrepresentation to constitute fraud which invalidates contract ... the party to whom it is made must be ignorant of its falsity, must reasonably believe it to be true, must act thereon to his damage, and in so acting must rely on the truth of the statement...."). *See also Galli v. Metz*, 973 F.2d 145, 151 (2d Cir.1992) ("Where a buyer closes on a contract in the full knowledge and acceptance of facts disclosed by the seller which would constitute a breach in warranty under the terms of the contract ... the buyer has waived the

---

**70.** For instance, the Trustee did not impugn the Ritchie entities' conduct in negotiation as part of a comprehensive plan to exploit a non-memorialized, preexisting event of default if necessary, and hence a violation of the implied covenant of good faith and fair dealing under Illinois law. *See Northern Trust Co. v. VIII South Michigan Assocs.*, 276 Ill.App.3d 355, 212 Ill.Dec. 750, 657 N.E.2d 1095, 1104 (1995). *See also Coleman v. Madison Two Assocs.*, 307 Ill.App.3d 570, 241 Ill.Dec. 97, 718 N.E.2d 668, 676 (1999) (interpreting implied covenant of good faith as "promise to do nothing which will destroy or injure the other party's right to receive the fruits of the contract").

breach. . . ."). In a different light, the fact that Tom Petters and Thane Ritchie both knew of the pendency of the Acorn lawsuit prevents it and its potential impact on their entities' relationship from falling under the warranty of § 7(e) of the extension agreement. *MacNeil Auto. Prods., Ltd. v. Cannon Auto. Ltd.*, 715 F.Supp.2d, 786, 794–795 (N.D.Ill.2010) (citing *Royal Bus. Machines, Inc. v. Lorraine Corp.*, 633 F.2d 34, 41, 45 (7th Cir.1980)).[71]

On the unrebutted evidence construed most favorably to the Ritchie Defendants, the finding is required: the pendency of the Acorn litigation, with its implications for any pledge of the Polaroid Corporation's assets, was fully known to all parties to the extension agreement, through the awareness of Tom Petters and Thane Ritchie—and several weeks before September 19, 2008. So, the Ritchie entities could not have declared a default on that ground before September 19. The Trustee does not identify any other ground to vitiate its enforceability that obtained when it was given; so the extension of the maturity of the promissory notes had a cognizable value sufficient to constitute consideration for the trademark security interests given by Polaroid Corporation, under the state law of contract. *Ives v. McHard*, 103 Ill. 97

(1882). And the fact that the extension was to a date certain 90 days in the future only strengthened the case for its adequacy, because Illinois law does not require an agreement to forbear to be in express terms or for an exact period of time in order to qualify as consideration for a grant of collateral security. *City Nat'l Bank of Hoopeston v. Russell*, 246 Ill. App.3d 302, 186 Ill.Dec. 251, 615 N.E.2d 1308, 1312 (1993).

This means that the Trustee has not demonstrated his entitlement to judgment as a matter of law, on the uncontroverted facts that he presented for his own motion.[72] His motion for summary judgment on Count X must be denied. Because he as movant must be deemed to have taken his best shot on this whole claim, on all evidence that he would have mustered at trial, it is appropriate to grant judgment to the Ritchie Defendants on this count.[73]

### V. Outcome.

The Trustee is entitled to judgment in his favor on Counts I and III of his complaint, to avoid the Ritchie Defendants' security interests in the Polaroid Corporation's trademarks as the result of fraudulent transfers under federal and state law.

---

71. The Trustee's other efforts to distinguish the three cases cited by the Ritchie Defendants are without merit, particularly since he still cited no case law of his own to support his conclusory theory.

72. There is another observation to be made, even though it is superfluous by this point. The Trustee's theory on this count was curiously abstract, distanced, and overly lawyerly. The preexisting circumstance on which he would have everything invalidated was not even the one that the Ritchie Defendants asserted when they tried to pull the plug a few days later. The logical (if rhetorical) question would be: if it all was a cynically-planned vehicle of exploitation on the part of the Ritchie Defendants, with the intention to seize the trademarks almost immediately, why did

they not cite the Acorn litigation in addition to the FBI raid when they declared default? These considerations further dilute the logic of characterizing the extension and lien grant as inequitable overreaching on their part, for this one alternate theory.

73. That adjudication can be formally made at this point, even though the Ritchie Defendants did not make their own motion for summary judgment on any of the counts entailed by the Trustee's motion. *Celotex Corp. v. Catrett*, 477 U.S. at 325–326, 106 S.Ct. 2548. *Figg v. Russell*, 433 F.3d 593, 597 (8th Cir.2006); *Bendet v. Sandoz Pharm. Corp.*, 308 F.3d 907, 911–912 (8th Cir.2002); *Shur-Value Stamps, Inc. v. Phillips Petroleum Co.*, 50 F.3d 592, 595 (8th Cir.1995).

He is also entitled to judgment on Counts VI and VII, to disallow the claims that the Ritchie Defendants have filed against the estate in the Polaroid Corporation's case, in consequence of the avoidance of their liens. On the other hand, the Ritchie Defendants are entitled to judgment in their favor, on Count X of the Trustee's complaint.

However, because the Trustee's motion involved "one or more, but fewer than all, claims" in suit at his instance in this adversary proceeding, neither side will receive formal entry of judgment at this point. *Clos v. Corrs. Corp. of America*, 597 F.3d 925, 928 (8th Cir.2010); *Clark v. Baka*, 593 F.3d 712, 715 (8th Cir.2010); *Taco John's of Huron, Inc. v. Bix Produce Co., LLC*, 569 F.3d 401 (8th Cir.2010) (all disfavoring the making of certification for entry of judgment under Fed.R.Civ.P. 54(b), on posture of litigation presented here). *See also In re Hicks*, 369 B.R. 420, 422–423 (8th Cir. BAP 2007); *In re Strong*, 293 B.R. 764, 767–768 (8th Cir. BAP 2003) (ditto, in application of Fed. R. Bank. P. 7054). The balance of the Trustee's theories of suit are the next matter for litigation in this adversary proceeding, or for some other resolution in the wake of the present rulings.

### ORDER

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED:

1. The Plaintiff's motion for summary judgment is granted as to Counts I, III, VI, and VII of his complaint, and denied as to Count X.

2. The Defendants are entitled to judgment in their favor on Count X of the Plaintiff's complaint.

3. The grant of security interests under the Trademark Security Agreement executed on September 19, 2009 on behalf of Debtor Polaroid Corporation is avoided, as a transfer fraudulent under 11 U.S.C. § 548(a)(1)(A) and Minn.Stat. § 513.44(a)(1).

4. Pursuant to 11 U.S.C. § 551, the avoidance of transfer under Term 3 is preserved for the benefit of the bankruptcy estate of Debtor Polaroid Corporation, which shall now assume the same position as lienor against the proceeds of the sale of the subject collateral that was created in connection with the sale of those assets free and clear of liens in BKY 08–46617.

5. The Defendants' claims against the estate in the case of Debtor Polaroid Corporation, BKY 08–46617, are disallowed in their entirety.

6. The grant of security interests described in Term 3 was and is not unenforceable for failure of consideration, as a matter of applicable state law.

ENTRY OF JUDGMENT ON TERMS 3–6 SHALL BE DEFERRED, PENDING FURTHER ORDER.